Sealed

Public and unofficial staff access
to this instrument are
prohibited by court order.

United States District Court
Southern District of Texas
FILED

NOV 2 4 2008

Michael N. Milby
Clerk of Court

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | **FILED UNDER SEAL** |
| ) | |
| Plaintiff, ) | Criminal No. *4:08 CR 763* |
| ) | |
| v. ) | 18 U.S.C. § 1349 |
| ) | 18 U.S.C. § 1341 |
| SAMIR RAFIC KHOURY, ) | 18 U.S.C. § 1343 |
| ) | 18 U.S.C. § 1346 |
| Defendant. ) | |

### INDICTMENT

The Grand Jury charges:

### COUNT 1

### Conspiracy to Commit Mail and Wire Fraud
### (18 U.S.C. § 1349)

**I.    Introduction**

At all times material to this Indictment, unless otherwise stated:

1.    Defendant SAMIR RAFIC KHOURY was a citizen of the United

States and a citizen of Lebanon.  From in or about 1988, until in or about

February 2004, when he moved to Lebanon, Khoury's primary residence

was in Cleveland, Ohio.  From in or about 1977, until in or about 1988,

KHOURY was an employee of The M.W. Kellogg Company ("Kellogg").

In or about 1988, KHOURY resigned from Kellogg and became a consultant

1

to Kellogg and subsequently Kellogg's successor, Kellogg, Brown & Root, Inc. ("KBR"), among other firms.

2.     Before September 1998, Kellogg was a wholly owned subsidiary of Dresser Industries, Inc. ("Dresser"), a publicly traded U.S. corporation. In September 1998, Halliburton Company ("Halliburton") merged with Dresser, and Dresser's Kellogg subsidiary was merged with Halliburton's Brown & Root construction subsidiary to form KBR.  Kellogg and subsequently KBR were engaged in the business of providing engineering, procurement, and construction ("EPC") services around the world, including designing and building liquefied natural gas ("LNG") production plants, ethylene production plants, and other petrochemical production plants.  At all times relevant to this Indictment, Kellogg and KBR were incorporated in Delaware and headquartered in Houston, Texas.  Halliburton was incorporated in Delaware and headquartered in Dallas, Texas, until 2002, when it became headquartered in Houston, Texas.

3.     Albert Jackson Stanley ("Stanley") was a resident of Houston, Texas.  From in or about March 1991, until in or about June 1995, Stanley was Executive Vice President of Kellogg.  From in or about June 1995, until in or about 1997, Stanley was President of Kellogg.  From in or about 1997, until September 1998, Stanley was Chairman and Chief Executive Officer of

Kellogg.  From on or about September 29, 1998, to on or about March 31,

2001, Stanley was President and Chief Executive Officer of KBR.  From on

or about April 1, 2001, until he was terminated on or about June 16, 2004,

Stanley was the Chairman of KBR, first as an employee and then, after

January 1, 2004, pursuant to a consulting agreement.

4.      As an officer and employee of Kellogg, STANLEY owed a

fiduciary duty of loyalty, fidelity, and allegiance to Kellogg and Dresser.  As

an officer and employee of KBR, STANLEY owed a fiduciary duty of

loyalty, fidelity, and allegiance to KBR and Halliburton.  Under his

consulting agreement with Halliburton, STANLEY owed a fiduciary duty of

loyalty, fidelity, and allegiance to KBR and Halliburton.

5.      Gulf Commercial Agencies ("GCA") was a British Virgin Islands

corporation established in or about 1993 that KHOURY used as a corporate

vehicle for his consulting business.  Bank accounts for GCA and for an

acquaintance (the "GCA Nominee Owner") were established in Switzerland.

The GCA Nominee Owner and others served as the nominal owners and

directors of GCA and as the signatories for GCA's and the GCA Nominee

Owner's bank accounts.  KHOURY caused GCA to enter into a series of

consulting agreements with Kellogg and KBR.  KHOURY caused GCA's

consulting contracts to be signed in the name of the GCA Nominee Owner

rather than in Khoury's own name. GCA's activities and its bank accounts were in fact controlled by and for the benefit of KHOURY.

6.     The GCA agreements with Kellogg and KBR generally provided for GCA to receive much larger fees than KHOURY previously had received from Kellogg. At least five of the agreements between GCA and Kellogg or KBR provided for a fixed $10 million success fee if the LNG plant project covered by the agreement was awarded to Kellogg or KBR. From in or about January 1996, until in or about December 2003, Kellogg and KBR paid GCA approximately $34 million in consulting fees in connection with EPC contracts that Kellogg or KBR won to design and/or build LNG plants in the Sultanate of Oman, the Federal Republic of Nigeria, Qatar, Malaysia, the Republic of Indonesia, and the Arab Republic of Egypt.

7.     In return for Stanley assisting KHOURY in obtaining lucrative consulting fees from Kellogg and KBR, KHOURY paid Stanley kickbacks of approximately $4 million from consulting fees that Kellogg had paid to a KHOURY-controlled consulting company in Lebanon (the "Lebanese Consulting Company") in connection with an LNG project in Malaysia and of approximately $7 million from consulting fees that Kellogg and KBR had paid to GCA in connection with an LNG project in Nigeria and another LNG project in Malaysia.

## II.    The Conspiracy and the Scheme to Defraud

8.    Beginning no later than in or about December 1991, and continuing to in or about 2004, in the Southern District of Texas, and elsewhere, defendant KHOURY did unlawfully, willfully, and knowingly combine, conspire, confederate, and agree, with Stanley and with others, known and unknown to the Grand Jury, to commit offenses against the United States of America, to wit: to devise and attempt to devise a scheme and artifice to defraud and obtain money and property from Kellogg, KBR, and others by means of false and fraudulent pretenses, representations, and promises, and to defraud Kellogg, Dresser, KBR, and Halliburton of their rights to their employee's honest services, and did knowingly use the mails and interstate wires for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346.

## III.    Purpose of the Conspiracy and Scheme to Defraud

9.    The purpose and object of the conspiracy was for KHOURY and Stanley to unjustly enrich themselves by obtaining money and property falsely and fraudulently from Kellogg, KBR, and others in the form of consulting fees which were paid, directly or indirectly, to KHOURY and portions of which, in turn, were paid by KHOURY to Stanley as "kickbacks."

**IV.    Manner and Means of the Conspiracy and Scheme to Defraud**

10.    KHOURY and Stanley employed various manner and means to carry out the conspiracy, including but not limited to the following:

a.    Stanley caused Kellogg and KBR to enter into lucrative consulting agreements with KHOURY or companies designated and controlled by KHOURY in connection with various LNG projects around the world.

b.    Pursuant to the consulting agreements, KHOURY or companies designated and controlled by KHOURY were paid tens of millions of dollars in "success" fees on LNG projects obtained by Kellogg and KBR.

c.    KHOURY paid kickbacks to Stanley out of the consulting fees that Kellogg and KBR had paid KHOURY or companies designated and controlled by KHOURY.

d.    KHOURY and Stanley concealed from Kellogg and KBR that KHOURY was paying kickbacks to Stanley out of consulting fees that Kellogg and KBR had paid KHOURY or companies designated and controlled by KHOURY.

e.      KHOURY and Stanley caused the kickbacks to be routed

through Swiss bank accounts, including through accounts held in the names

of nominees and shell companies, in order to conceal their scheme.

## V.      Overt Acts

11.      In furtherance of the conspiracy and to achieve its purpose and

object, at least one of the co-conspirators committed or caused to be

committed, in the Southern District of Texas, and elsewhere, the following

overt acts, among others:

a.      On or about December 23, 1991, Stanley signed a Kellogg

approval request form for a $9 million consulting agreement with the

Lebanese Consulting Company in connection with an LNG project in

Malaysia.

b.      On or about January 3, 1992, Stanley signed the Kellogg

approval form authorizing a $9 million consulting agreement between

Kellogg and the Lebanese Consulting Company in connection with an LNG

project in Malaysia.

c.      On or about April 6, 1992, Stanley signed a new Kellogg

approval request form for the consulting agreement with the Lebanese

Consulting Company increasing the fee to $15 million.

d.      On or about April 7, 1992, Stanley signed the Kellogg approval form authorizing the $15 million consulting agreement between Kellogg and the Lebanese Consulting Company in connection with an LNG project in Malaysia.

e.      On or about April 7, 1992, Stanley caused Kellogg to sign a $15 million consulting agreement with the Lebanese Consulting Company in connection with an LNG project in Malaysia.

f.      On or about April 25, 1992, Stanley approved on Kellogg's behalf a $1.5 million "Finder's Agreement" between the Lebanese Consulting Company and another company controlled by KHOURY.

g.      On or about May 18, 1992, the Lebanese Consulting Company received in its Swiss bank account a $5 million wire transfer from Kellogg pursuant to the consulting agreement for the Malaysia LNG project.

h.      On or about May 21, 1992, the Lebanese Consulting Company wire transferred $1,374,750 to a Swiss bank account controlled by Stanley.

i.      On or about June 30, 1992, the Lebanese Consulting Company received in its Swiss bank account a $1,502,000 wire transfer from Kellogg pursuant to the consulting agreement for the Malaysia LNG project.

j.      On or about July 6, 1992, the Lebanese Consulting Company wire transferred $412,936.63 to a Swiss bank account controlled by Stanley.

k.      On or about September 30, 1992, the Lebanese Consulting company received in its Swiss bank account a $624,000 wire transfer from Kellogg pursuant to the consulting agreement for the Malaysia LNG project.

l.      On or about September 30, 1992, the Lebanese Consulting Company wire transferred $171,515.86 to a Swiss bank account controlled by Stanley.

m.      On or about December 31, 1992, the Lebanese Consulting Company received in its Swiss bank account a $718,000 wire transfer from Kellogg pursuant to the consulting agreement for the Malaysia LNG project.

n.      On or about January 7, 1993, the Lebanese Consulting Company wire transferred $197,307.62 to a Swiss bank account controlled by Stanley.

o.      On or about March 31, 1993, the Lebanese Consulting Company received in its Swiss bank account a $716,000 wire transfer from Kellogg pursuant to the consulting agreement for the Malaysia LNG project.

p.      On or about March 31, 1993, the Lebanese Consulting Company wire transferred $196,850.22 to a Swiss bank account controlled by Stanley.

q.      On or about June 30, 1993, the Lebanese Consulting Company received in its Swiss bank account a $947,000 wire transfer from Kellogg pursuant to the consulting agreement for the Malaysia LNG project.

r.      On or about July 2, 1993, the Lebanese Consulting Company wire transferred $260,347.93 to a Swiss bank account controlled by Stanley.

s.      On or about September 30, 1993, the Lebanese Consulting Company received in its Swiss bank account a $993,000 wire transfer from Kellogg pursuant to the consulting agreement for the Malaysia LNG project.

t.      On or about October 5, 1993, the Lebanese Consulting Company wire transferred $273,011.75 to a Swiss bank account controlled by Stanley.

u.      On or about December 31, 1993, the Lebanese Consulting Company received in its Swiss bank account an $896,000 wire transfer from Kellogg pursuant to the consulting agreement for the Malaysia LNG project.

v.      On or about January 4, 1994, the Lebanese Consulting Company wire transferred $246,283.79 to a Swiss bank account controlled by Stanley.

w.      On or about March 31, 1994, the Lebanese Consulting Company received in its Swiss bank account a $901,000 wire transfer from Kellogg pursuant to the consulting agreement for the Malaysia LNG project.

x.      On or about April 7, 1994, the Lebanese Consulting Company wire transferred $247,659.96 to a Swiss bank account controlled by Stanley.

y.      On or about May 5, 1994, Stanley signed a Dresser code of conduct certification in which he failed to disclose any of the millions of dollars of kickbacks he had received from KHOURY.

z.      On or about June 30, 1994, the Lebanese Consulting Company received in its Swiss bank account a $901,000 wire transfer from Kellogg pursuant to the consulting agreement for the Malaysia LNG project.

aa.     On or about July 6, 1994, the Lebanese Consulting Company wire transferred $247,717.31 to a Swiss bank account controlled by Stanley.

bb.   On or about September 30, 1994, the Lebanese Consulting Company received in its Swiss bank account a $901,000 wire transfer from Kellogg pursuant to the consulting agreement for the Malaysia LNG project.

cc.   On or about October 4, 1994, the Lebanese Consulting Company wire transferred $247,704.99 to a Swiss bank account controlled by Stanley.

dd.   On or about December 30, 1994, the Lebanese Consulting Company received in its Swiss bank account a $901,000 wire transfer from Kellogg pursuant to the consulting agreement for the Malaysia LNG project.

ee.   On or about January 5, 1995, the Lebanese Consulting Company wire transferred $247,717.09 to a Swiss bank account controlled by Stanley.

ff.   On or about August 18, 1995, Stanley signed a Dresser code of conduct certification in which he failed to disclose any of the millions of dollars of kickbacks he had received from KHOURY.

gg.   On or about January 22, 1996, Stanley signed a consulting agreement between Kellogg and GCA which provided, among other things, that Kellogg would pay GCA a $10 million success fee in connection with the LNG project in Nigeria.

hh.    On or about January 24, 1996, Stanley signed the Kellogg approval form authorizing a $10 million consulting agreement between Kellogg and GCA for the LNG project in Nigeria.

ii.    On or about February 5, 1996, Stanley sent a facsimile from Houston, Texas, to KHOURY in London, England, stating that the first payment to GCA under its consulting agreement for Nigeria should be made by wire transfer the next day.

jj.    On or about February 7, 1996, KHOURY received in GCA's bank account in Switzerland a $5 million wire transfer from Kellogg pursuant to the consulting agreement for the Nigeria LNG project.

kk.    On or about February 14, 1996, KHOURY wire transferred $1.2 million from one of his Swiss bank accounts to a Swiss bank account controlled by Stanley.

ll.    On or about June 4, 1996, KHOURY received in GCA's bank account in Switzerland a $2.5 million wire transfer from Kellogg pursuant to the consulting agreement for the Nigeria LNG project.

mm.   On or about June 25, 1996, KHOURY wire transferred $375,000 from his Swiss bank account to a Swiss bank account controlled by Stanley.

13

nn.    On or about September 18, 1996, Stanley caused to be opened a Swiss bank account in the name of Amal Development Inc., a Panama corporation ("Amal").

oo.    On or about November 27, 1996, KHOURY received in GCA's bank account in Switzerland a $2.5 million wire transfer from Kellogg pursuant to the consulting agreement for the Nigeria LNG project.

pp.    On or about December 12, 1996, KHOURY wire transferred $375,000 from his Swiss bank account to a Swiss bank account controlled by STANLEY.

qq.    On or about May 23, 1997, Stanley signed a Dresser code of conduct certification in which he failed to disclose any of the millions of dollars of kickbacks he had received from KHOURY.

rr.    On or about April 20, 1998, Stanley signed a Dresser code of conduct certification in which he failed to disclose any of the millions of dollars of kickbacks he had received from KHOURY.

ss.    On or about August 19, 1998, Stanley signed the Kellogg approval form authorizing a $10 million consulting agreement between Kellogg and GCA for a new phase of an LNG project in Malaysia.

tt.    On or about August 19, 1998, Stanley signed a consulting agreement between Kellogg and GCA which provided, among other things,

that Kellogg would pay GCA a $10 million success fee if an EPC contract to build a new phase of an LNG plant in Malaysia was awarded to Kellogg's consortium.

uu.   On or about March 19, 1999, KHOURY sent the executed consulting agreement between Kellogg and GCA for the new phase of the Malaysia LNG project via Federal Express from Ohio to the legal department of Kellogg in Houston, Texas.

vv.   On or about November 12, 1999, Stanley submitted his Halliburton code of conduct certification in which he failed to disclose any of the millions of dollars of kickbacks that he had received from KHOURY.

ww.   On or about December 3, 1999, Stanley signed a letter addressed to GCA increasing the success fee for the Malaysia LNG project to $13.3 million.

xx.   On or about December 17, 1999, Stanley signed the KBR approval form authorizing a $3.3 million increase in GCA's consulting fee for the LNG project in Malaysia.

yy.   On or about December 24, 1999, KHOURY received in GCA's bank account in Switzerland a $2.5 million wire transfer from KBR pursuant to the consulting agreement for the Malaysia LNG project.

zz.     On or about December 27, 1999, GCA wire transferred $2.5 million to a Swiss bank account that KHOURY had opened in an acquaintance's name.

aaa.     On or about December 27, 1999, KHOURY caused $2.5 million to be wire transferred from the acquaintance's Swiss bank account to another Swiss bank account that KHOURY controlled (the "Nominee Swiss Account").

bbb.     On or about January 18, 2000, KHOURY caused $1 million to be wire transferred from the Nominee Swiss Account to the Swiss bank account of Amal Development for the benefit of Stanley.

ccc.     On or about February 14, 2000, KHOURY received in GCA's bank account in Switzerland a $825,000 wire transfer from KBR pursuant to the consulting agreement for the Malaysia LNG project.

ddd.     On or about July 20, 2000, KHOURY received in GCA's bank account in Switzerland a $3.325 million wire transfer from KBR pursuant to the consulting agreement for the Malaysia LNG project.

eee.     On or about August 28, 2000, GCA wire transferred $1.25 million to the Swiss bank account of Amal Development for the benefit of Stanley.

fff.    On or about October 2, 2000, Stanley submitted his Halliburton code of conduct certification in which he failed to disclose any of the millions of dollars of kickbacks he had received from KHOURY.

ggg.    On or about December 8, 2000, KHOURY received in GCA's bank account in Switzerland a $3.325 million wire transfer from KBR pursuant to the consulting agreement for the Malaysia LNG project.

hhh.    On or about January 16, 2001, GCA wire transferred $1.25 million to the Swiss bank account of Amal Development for the benefit of Stanley.

iii.    On or about June 1, 2001, Stanley, as Chairman of KBR, signed the KBR approval form authorizing a $10 million consulting agreement between KBR and GCA for an LNG project in Yemen.

jjj.    On or about June 1, 2001, Stanley, as Chairman of KBR, signed the KBR approval form authorizing a $10 million consulting agreement between KBR and GCA for an LNG project in Egypt.

kkk.    On or about June 6, 2001, KHOURY received in GCA's bank account in Switzerland a $3.325 million wire transfer from KBR pursuant to the consulting agreement for the Malaysia LNG project.

lll.    On or about July 26, 2001, KBR signed a consulting agreement between KBR and GCA which provided, among other things, that

KBR would pay GCA a $10 million success fee if an LNG project in Egypt was awarded to KBR's consortium.

mmm.   On or about August 2, 2001, GCA wire transferred $3.27 million from GCA's Swiss bank account to the Nominee Swiss Account.

nnn.   On or about August 6, 2001, KHOURY caused $1.25 million to be wire transferred from the Nominee Swiss Account to the Swiss bank account of Amal Development for the benefit of Stanley.

ooo.   On or about August 20, 2001, Stanley signed a consulting agreement between KBR and GCA which provided, among other things, that KBR would pay GCA a $10 million success fee if an LNG project in Yemen was awarded to KBR's consortium.

ppp.   On or about September 24, 2001, Stanley submitted his Halliburton code of conduct certification in which he failed to disclose any of the millions of dollars of kickbacks he had received from KHOURY.

qqq.   On or about January 16, 2002, GCA submitted an invoice to KBR for $2.5 million pursuant to the consulting agreement for the Egypt LNG project.

rrr.   On or about February 19, 2002, KHOURY received in GCA's bank account in Switzerland a $2.5 million wire transfer from KBR pursuant to the consulting agreement for the Egypt LNG project.

sss.    On or about May 15, 2002, GCA submitted an invoice to KBR for $2.5 million pursuant to the consulting agreement for the Egypt LNG project.

ttt.    On or about June 5, 2002, Stanley caused an email to be sent to the sales person responsible for an LNG project in Indonesia notifying the sales person that he would be contacted by KHOURY and instructing him to give KHOURY his full cooperation.

uuu.    On or about June 5, 2002, KHOURY received in GCA's bank account in Switzerland a $2.5 million wire transfer from KBR pursuant to the consulting agreement for the Egypt LNG project.

vvv.    On or about November 20, 2002, GCA submitted an invoice to KBR for $2.5 million pursuant to the consulting agreement for the Egypt LNG project.

www. On or about December 19, 2002, KHOURY received in GCA's bank account in Switzerland a $2.5 million wire transfer from KBR pursuant to the consulting agreement for the Egypt LNG project.

xxx.    On or about April 15, 2003, in Houston, Texas, Stanley signed a consulting agreement between KBR and GCA which provided, among other things, that KBR would pay GCA a $10 million success fee if an LNG project in Indonesia was awarded to KBR's consortium.

yyy.   On or about April 24, 2003, KHOURY caused a KBR employee to send from Houston, Texas, to KHOURY in London, United Kingdom, the executed consulting agreement for the LNG project in Indonesia.

zzz.   On or about July 29, 2003, KHOURY received in GCA's bank account in Switzerland a $2.5 million wire transfer from KBR pursuant to the consulting agreement for the Egypt LNG project.

aaaa.   In or about early 2004, KHOURY and Stanley discussed cover stories they could use to explain Stanley's receipt of payments from companies controlled by KHOURY.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2-8

Wire Fraud
(18 U.S.C. §§ 1343, 1346, and 2)

12.   Paragraphs 1 through 7 and 9 through 11 are realleged and incorporated by reference as if set forth fully herein.

13.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, defendant KHOURY, and others, known and unknown to the Grand Jury, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to deprive Kellogg, Dresser,

20

KBR, and Halliburton of their intangible rights to their employee's honest services, for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds, including the following:

| Count | Date | From/To | Substance |
|-------|------|---------|-----------|
| 2 | 12/08/00 | Houston/Scranton | Wire re: transfer of $3.325M to GCA |
| 3 | 6/7/01 | Houston/Scranton | Wire re: transfer of $3.325M to GCA |
| 4 | 2/15/02 | Houston/New York | Wire re: transfer of $2.5M to GCA |
| 5 | 6/5/02 | Houston/Jakarta | Email from Stanley re: Khoury |
| 6 | 6/5/02 | Houston/New York | Wire re: transfer of $2.9M to GCA |
| 7 | 12/18/02 | Houston/New York | Wire re: transfer of $2.5M to GCA |
| 8 | 7/29/03 | Houston/New York | Wire re: transfer of $2.5M to GCA |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNTS 9–11

### Mail Fraud
(18 U.S.C. §§ 1341, 1346, and 2)

14.    Paragraphs 1 through 7 and 9 through 11 are realleged and incorporated by reference as if set forth fully herein.

15.     On or about the dates set forth below, in the Southern District of

Texas and elsewhere, defendant KHOURY, and others, known and unknown

to the Grand Jury, having devised a scheme and artifice to defraud and to

obtain money and property by means of materially false and fraudulent

pretenses, representations, and promises, and to deprive Kellogg, Dresser,

KBR, and Halliburton of their intangible right to their employee's honest

services, for the purpose of executing such scheme and artifice, caused to be

deposited for delivery by interstate carrier the following:

| Count | Date | From/To | Interstate Carrier | Substance |
|-------|------|---------|--------------------|-----------|
| 9 | 7/27/01 | Houston/Ohio | Federal Express | GCA agreement for Egypt project |
| 10 | 8/24/01 | Houston/Ohio | Federal Express | GCA agreement for Yemen project |
| 11 | 4/24/03 | Houston/London | DHL | GCA agreement for Indonesia project |

All in violation of Title 18, United States Code, Sections 1341, 1346,

and 2.

## Forfeiture Allegations

16.     Paragraphs 1 through 7, 9 through 11, 13, and 15 are realleged and

incorporated by reference as if set forth fully herein.

Upon conviction of one or more of the offenses in violation of Title

18, United States Code, Sections 1341, 1343, and 1346 alleged in Counts 2

through 11 of this Indictment, defendant KHOURY shall forfeit to the

United States, pursuant to Title 28, United States Code, Section 2461, and Title 18, United States Code, Section 981(a)(1)(C), all property, real and personal, which constitutes or is derived from proceeds traceable to the violations, including but not limited to the following:

Approximately $49 million in United States Currency, all interest and other return thereon, and all property traceable thereto.

If any of the property described above as being subject to forfeiture, as a result of any act or omission of defendant KHOURY,

    (1)    cannot be located upon the exercise of due diligence;

    (2)    has been transferred or sold to or deposited with a third person;

    (3)    has been placed beyond the jurisdiction of the Court;

    (4)    has been substantially diminished in value; or

    (5)    has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of defendant KHOURY up to the value of the above forfeitable property.

All pursuant to Title 18, United States Code, Section 2461, and Title 18, United States Code, Section 981(a)(1)(C), and Rule 32.2 of the Federal Rules of Criminal Procedure.

A TRUE BILL

ORIGINAL SIGNATURE ON FILE

Foreperson

STEVEN A. TYRRELL, CHIEF
FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

By: _William J. Stuckwisch_
William J. Stuckwisch
D.C. Bar No. 457278
Patrick F. Stokes
Maryland State Bar
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W., Room 3428
Washington, DC 20005
Tel: (202) 353-2393
Fax: (202) 514-0152