**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *Plaintiff*, | |
| | **Crim. No. 08-cr-763** |
| **v.** | |
| **SAMIR KHOURY,** | |
| *Defendant*. | |

**RENEWED MOTION OF SAMIR KHOURY TO DISMISS THE INDICTMENT
FOR VIOLATION OF HIS RIGHT TO A SPEEDY TRIAL, AND AS TIME-BARRED,
AND MEMORANDUM IN SUPPORT THEREOF**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 2

II.  FACTUAL AND PROCEDURAL BACKGROUND ..................................... 5

    A.  Samir Khoury ............................................................................................ 5

    B.  The Government's Investigation and Official Smearing of Mr. Khoury .............. 6

    C.  Mr. Khoury's First Attempt to Obtain Notice of Any Charges ............................ 8

    D.  August 2015 Briggs Action ................................................................... 10

    E.  Mr. Khoury's Second Attempt to Obtain Notice of Any Charges ...................... 10

    F.  The Record of the Government's "Diligence" ..................................... 11

III.  ARGUMENT ..................................................................................................... 14

    A.  Unsealing the Indictment Revealed Government-Caused Delay That Gives
        Rise to a Presumption of Prejudice, which the Government Cannot Rebut. ....... 15

        1.  Pre-trial Delay of Ten Years Weighs Heavily in Mr. Khoury's
            Favor. ............................................................................................. 17

        2.  The Government's Tactical Decision to Deny Mr. Khoury Notice
            of the Indictment, and Affirmative Actions to Prevent Unsealing,
            Make the Government Solely Responsible for the Delay. ...................... 18

            a.  The Government was required to give Mr. Khoury
                immediate notice of the Indictment, having publicly
                accused him of criminality two months earlier while
                denying him a forum to contest the accusations, in violation
                of his Due Process rights ............................................................. 18

            b.  At the very least, the Government was obliged to give Mr.
                Khoury notice of the charges once pre-trial delay
                approached one year and became presumptively
                prejudicial. .................................................................................. 21

            c.  Because the Government's concealment of the Indictment
                violated Due Process, and was both deliberate and
                persistent, the delay resulting from the sealing weighs
                heavily against the Government ................................................ 23

            d.  Because the government-caused delay was negligent at the
                very least, and the length of the delay is extraordinary, this
                factor weighs against the government ..................................... 24

        3.  Mr. Khoury's Prompt Assertion of His Sixth Amendment Speedy
            Trial Rights Weighs Heavily in His Favor. .......................................... 26

         4.  Mr. Khoury Need Not Show That He Has Been Prejudiced by the
            Government's Delay Because Prejudice Is Presumed. .......................... 28

# TABLE OF CONTENTS
(continued)

                                                                    **Page**

B.    Even If the Court Concludes That Prejudice Need Not Be Presumed, Mr. Khoury Has Demonstrated That He Has Been Prejudiced by the Delay............. 30

C.    The Indictment Is Time-Barred and Should be Dismissed................................. 33

    1.    Counts 2, 3, 9 and 10 of the Indictment Are Time-Barred. ..................... 33

    2.    The Sealing of the Indictment Lacked a Proper Purpose and Did Not Toll the Running of the Limitations Period for the Charges Not Already Time-Barred in November 2008. ........................................ 35

    3.    Even If the DOJ Had a Legitimate Reason to Seal the Indictment Temporarily, Continued Sealing Beyond One Year Was Unjustified and Did Not Thereafter Toll the Running of the Limitations Period....................................................................................... 38

    4.    Because Indefinite Sealing of the Indictment Was Improper, Mr. Khoury Need Not Show That He Was Prejudiced................................. 39

    5.    Alternatively, Because Sealing of the Indictment Actually and Substantially Prejudiced Mr. Khoury's Ability to Defend Against the Charges, the Running of the Limitations Period Was Not Tolled. .................................................................................................. 39

    6.    All Remaining Charges Are Time-Barred and Should Be Dismissed................................................................................................ 40

IV.    CONCLUSION............................................................................................. 42

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

CASES

*Barker v. Wingo,*
 407 U.S. 514 (1972).............................................................................. *passim*

*Doe v. United States,*
 197 F. Supp. 3d 933 (S.D. Tex. 2016) ...................................................10

*Doe v. United States,*
 853 F.3d 792 (5th Cir. 2017) ......................................................... *passim*

*Doe v. United States,*
 No. H-15-02414 (Aug. 20, 2015)............................................................10

*Doggett v. United States,*
 505 U.S. 647 (1992)......................................................................... *passim*

*FDIC v. Belli,*
 981 F.2d 838 (5th Cir.1993) ...................................................................35

*Mathews v. Eldridge,*
 424 U.S. 319 (1976).................................................................................21

*Sealed Appellee 1 v. Sealed Appellant 1,*
 No. 15-98003 (5th Cir. 2015) ............................................................9, 10

*Smith v. Hooey,*
 393 U.S. 374 (1969).................................................................................30

*Toussie v. United States,*
 397 U.S. 112 (1970).................................................................................33

*United States v. Albert J. Stanley,*
 Crim. No. H-08-597 (KPE) (S.D. Tex. 2008)...................................2, 6, 7

*United States v. Bergfeld,*
 280 F.3d 486 (5th Cir. 2002) .......................................................... *passim*

*United States v. Bischel,*
 61 F.3d 1429 (9th Cir. 1995) ..................................................................34

*United States v. Briggs,*
 514 F.2d 794 (5th Cir. 1975) ...................................................2, 10, 20

*United States v. Brody*,
    621 F. Supp. 2d 1196 (D. Utah 2009) ................................................................34

*United States v. Brown*,
    169 F.3d 344 (6th Cir. 1999) ............................................................. *passim*

*United States v. Cardona*,
    302 F.3d 494 (5th Cir. 2002) ........................................................17, 30

*United States v. Cosolito*,
    488 F. Supp. 531 (D. Mass. 1980) ................................................................41

*United States v. Csolkovits*,
    No. 08- cr-20474, 2012 WL 395450 (E.D. Mich. Feb. 7, 2012) ...........................................34

*United States v. Deglomini*,
    111 F. Supp. 2d 198 (E.D.N.Y. 2000) ........................................................38, 39, 41

*United States v. Fernandes*,
    618 F. Supp. 2d 62 (D.D.C. 2009) ................................................................31

*United States v. Gigante*,
    436 F. Supp. 2d 647 (S.D.N.Y. 2006) ........................................................35, 36, 41

*United States v. Heckler*,
    428 F. Supp. 269 (S.D.N.Y. 1976) ........................................................23, 38, 41

*United States v. Heshelman*,
    521 F. App'x 501 (6th Cir. 2013) ............................................................. *passim*

*United States v. Holy Land Found. for Relief & Dev.*,
    624 F.3d 685 (5th Cir. 2010) ........................................................20, 21

*United States v. JGC Corp.*,
    Crim. No. 11-CR-260 (KPE) (S.D. Tex. April 6, 2011)...........................................................8

*United States v. Judge*,
    425 F. Supp. 499 (D. Mass. 1976) ................................................................22

*United States v. Kellogg Brown & Root, LLC*,
    Crim. No. H-09-071 (KPE) (S.D. Tex. Feb. 11, 2009)...........................................................8

*United States v. Khoury*,
    No. 4:17-MC-2553, 2018 WL 2864413 (S.D. Tex. June 11, 218) ........................9, 11, 14, 23

*United States v. Kozeny*,
    541 F.3d 166 (2d Cir. 2008)...........................................................34, 35

iv

*United States v. Leaver,*
   358 F. Supp. 2d 255 (S.D.N.Y. 2004).................................................15, 23, 28, 30

*United States v. Maroun,*
   699 F. Supp. 5 (D. Mass. 1988) ....................................................................36, 41

*United States v. McCoy,*
   786 F. Supp. 2d 1216 (S.D. Tex. 2011) ...................................................... *passim*

*United States v. Meador,*
   138 F.3d 986 (5th Cir. 1998) ...............................................................................34

*United States v. Mendoza,*
   530 F.3d 758 (9th Cir. 2008) ..............................................................22, 25, 26, 28

*United States v. Molina-Solorio,*
   577 F.3d 300 (5th Cir. 2009) .................................................................... *passim*

*United States v. Rogers,*
   781 F. Supp. 1181 (S.D. Miss. 1991).........................................................37, 38, 41

*United States v. Samir Khoury,*
   Misc. No. 4:17-mc-02553 (Sept. 29, 2017) .................................................9, 10, 11

*United States v. Schlor,*
   No. CR-01-360-RHW, 2008 WL 4949037 (C.D. Cal. Nov. 14, 2008) ............................16, 32

*United States v. Sharpe,*
   995 F.2d (5th Cir. 1993) .............................................................................4, 35, 38

*United States v. Shell,*
   974 F.2d 1035 (9th Cir. 1992) ....................................................................16, 30

*United States v. Shelton,*
   820 F. Supp. 461 (W.D. Mo. 1992) ......................................................................22

*United States v. Sherwood,*
   38 F.R.D. 14 (D. Conn. 1964)....................................................................37, 38, 41

*United States v. Snamprogetti Netherlands B.V.,*
   Crim. No. H-10-460 (KPE) (S.D. Tex. July 7, 2010) .................................................8

*United States v. Srulowitz,*
   819 F.2d 37 (2d Cir. 1987)....................................................................................35

*United States v. Technip S.A.,*
   Crim. No. H-10-439 (KPE) (S.D. Tex. June 28, 2010) ...........................................8

v

*United States v. Tesler, et al.*,
  Crim. No. H-09-098 (KPE) (S.D. Tex. Feb. 17, 2009)...........................................................8

*United States v. Thompson*,
  104 F. Supp. 2d 1303 (D. Kan. 2000) ...............................................................39, 41

*United States v. Toma*,
  869 F. Supp. 2d 1315 (D. Kan. 2012) ...............................................................30, 32

*United States v. Upton*,
  339 F. Supp. 2d 190 (D. Mass. 2004) ...............................................................41

*United States v. Velazquez*,
  749 F.3d 161 (3d Cir. 2014)...............................................................22, 26, 27, 32

*United States v. Whitlock*,
  698 F. App'x 220 (5th Cir. 2017) ...............................................................29, 30

## STATUTES, RULES & REGULATIONS

31 C.F.R. § 1010.430(d) ...............................................................32

18 U.S.C. § 3282...............................................................33

18 U.S.C. § 3292...............................................................33, 34, 35, 40

18 U.S.C. § 3292(a)(1)...............................................................34

18 U.S.C. § 3292(b) ...............................................................34

18 U.S.C. § 3292(c)(1)...............................................................34, 40

18 U.S.C. § 3292(c)(2)...............................................................34, 40

Fed. R. Crim. P. 15, 16, 17 ...............................................................40

## OTHER AUTHORITIES

Halliburton Co. Annual Report (Form 10-K) (March 8, 2004),
  http://services.corporate-
  ir.net/SEC.Enhanced/SecCapsule.aspx?c=67605&fid=2655253 ...............................................................6

Peter M. Thomson, *Interpol's Transnational Policing By "Red Notice" and
  "Diffusions": Procedural Standards, Systemic Abuses, and Reforms
  Necessary to Assure Fairness and Integrity*, Engage: Volume 16, Issue 2 (July
  2015), https://fedsoc.org/commentary/publications/interpol-s-transnational-
  policing-by-red-notice-and-diffusions-procedural-standards-systemic-abuses-
  and-reforms-necessary-to-assure-fairness-and-integrity...............................................................12

U.S. Const. Amendment VI ...................................................................................1, 15, 24, 26

U.S. Department of Justice Manual (2018 ed.), § 9-15.100,
    https://www.justice.gov/jm/jm-9-15000-international-extradition-and-related-
    matters#9-15.100 .........................................................................................................13, 14

*Understanding Natural Gas and LNG Options*, U.S. Dep't of Energy (Nov. 2016),
    http://www.energy.gov/sites/prod/files/2016/12/f34/Understanding Natural
    Gas and LNG Options.pdf ...............................................................................................5

96105545.20

There are some cases where the Department of Justice ("DOJ") may have a legitimate interest in sealing an indictment in order to arrest a defendant by surprise.  This is not such a case.  First, months before indicting Samir Khoury the DOJ publicly identified him as an unindicted co-conspirator.  This violated long-standing Fifth Circuit law that requires the government promptly to afford a defendant a forum to contest public accusations, a Due Process requirement that supersedes any interest in making a surprise arrest.

Second, even when sealing is initially warranted, the government's interest in making a surprise arrest must give way to its obligations under the Sixth Amendment.  Because the Speedy Trial right is fundamental, pre-trial delay of more than one year requires courts to conduct a full Speedy Trial analysis.  As that threshold approaches, the government ***must*** notify a defendant whose location is known that he has been indicted, thereby affording him the opportunity to assert his Speedy Trial right.

Here, instead, the government not only concealed the charges from Mr. Khoury for over a decade, it also exercised no meaningful diligence during that time.  In the ***more than six years*** between the return of the Indictment and the filing of Mr. Khoury's first motion to unseal and dismiss it, the government did no more than send a single perfunctory notice to select countries—but not to Lebanon, where the DOJ knew he lived—that Mr. Khoury was a wanted person.  The government insisted that the Indictment remain sealed for ***nearly four more years*** after Mr. Khoury asserted his Speedy Trial right.  Sealing, however, is not a license to lie in wait indefinitely and frustrate the vindication of a fundamental constitutional right.

Finally, it is also the law of this Circuit that the government's ability to toll the running of the limitations period is not unlimited.  That rule necessarily constrains the time within which the government can execute a surprise arrest.  In this case, as noted, sealing was either void *ab initio*,

1

or no longer justified after pre-trial delay approached one year.  Thus, no later than November

2009 the government's interest in making a surprise arrest lost any legitimacy it may have had.

For these reasons, and many others explained below, the Indictment in this case is due to

be dismissed on both Speedy Trial and statute of limitations grounds.

## I.      INTRODUCTION

In September 2008, the DOJ accused Samir Khoury of being the "LNG Consultant," the

unindicted co-conspirator of the named defendant in *United States v. Albert J. Stanley*, Crim. No.

H-08-597 (KPE) (S.D. Tex. 2008) [Dkt. 1].  As explained below, the government's own

pleadings, as well as unrebutted witness testimony, demonstrate that ***only*** Mr. Khoury could be

the accused LNG Consultant.  Publicly identifying an unindicted co-conspirator violates Due

Process.  *United States v. Briggs*, 514 F.2d 794 (5th Cir. 1975).  The Fifth Circuit reiterated that

principle in this very matter when it found that the government sanctioned Mr. Khoury by

denying him a forum to contest these accusations:

> "[i]n accusing [Khoury] of a crime without providing a public forum in which
> [Khoury] could seek to vindicate his rights, namely a hearing or trial in a criminal
> court proceeding in which [Khoury] could defend the serious charges against him,
> the Government failed to act and failed to provide relief or a remedy to [Khoury].
> It accused [Khoury] of a crime without indicting him, without introducing evidence
> to prove the allegations, and without allowing [Khoury] to challenge that evidence
> and present evidence of his own.

*Doe v. United States*, 853 F.3d 792, 800 (5th Cir. 2017) (citation and internal quotations

omitted).  The Court further recognized that "the fundamental requirement of due process is the

opportunity to be heard at a ***meaningful time*** and in a meaningful manner."  *Id.* at 801 (citation

and internal quotations omitted) (emphasis added).

The government's violation of Mr. Khoury's Due Process rights informs the analysis of

the Speedy Trial claim presented in his Motion to Dismiss.  *Briggs,* 514 F.2d at 798 (recognizing

relationship between "public ignominy" of accusation and Speedy Trial right).  Because the

government was required to provide Mr. Khoury with a forum to contest the accusations "at a meaningful time," the sealing of the Indictment two months after the government officially smeared him was improper *ab initio*. As a result, the decade-long delay caused by the improper sealing weighs heavily against the government and in favor of Mr. Khoury in the analysis of the second *Barker* factor. *See Barker v. Wingo*, 407 U.S. 514 (1972).

As explained below, even if the government had not trenched upon Mr. Khoury's Due Process rights prior to procuring the Indictment, the indefinite sealing nevertheless violated his Speedy Trial right, which arose upon return of the Indictment. By the time the delay approached one year and became presumptively prejudicial, the government knew that Mr. Khoury was not traveling to the United States, or to any other location where he could be arrested by surprise. The government was then ***required*** to notify him of the charges and provide him the opportunity to contest them. *See* case cited at 21-22, *infra*. Yet, the government decided to deny Mr. Khoury the right to confront the charges when material witnesses and documents were still available. The government even resisted his efforts in 2014 and 2017 to obtain notice of the charges. These tactical decisions make the government solely responsible for the entire ten years of delay, prejudice to Mr. Khoury is presumed, and it is impossible for the government to demonstrate that his defenses were unimpaired by the delay. The remedy for this purposeful violation of Mr. Khoury's Speedy Trial right is dismissal of the Indictment.

If the Court were to conclude that the government's delay tactics were merely negligent, the extraordinary length of the delay still requires that prejudice to Mr. Khoury's defense be presumed. The Court has reviewed the government's *ex parte* submission of all the communications sent or received in its attempt to locate and apprehend Mr. Khoury. Those communications show that the government made one perfunctory effort—transmitting a notice to

select countries, not including Lebanon, that Mr. Khoury was a wanted person—in the more than six years between the return of the Indictment and the filing of Mr. Khoury's first motion to unseal and dismiss it.  Because these facts are undisputed, the decision on whether the government should be held accountable for failing to afford Mr. Khoury a speedy trial is now "one of law rather than fact."  *See* March 13, 2019 Memorandum and Order ("March 13 Order") at 1. And, the law is clear that government negligence, combined with extraordinary delay, weighs heavily in favor of the defendant and gives rise to a presumption of prejudice.  *See*, *e.g.*, *United States v. McCoy*, 786 F. Supp. 2d 1216 (S.D. Tex. 2011).

An independent reason for dismissing the Indictment is that it is time-barred.  The statute of limitations expired on Counts 2, 3, 9, and 10 long before the Indictment was returned in November 2008.  *See* case cited at 34-35, *infra*.  As for the other seven counts, the sealing did not toll the running of the limitations period because it was void *ab initio*.  Sealing was improper not only because it violated Mr. Khoury's Due Process rights, but also because none of the recognized grounds for sealing existed in November 2008.  Even assuming that **temporary** sealing could have been justified, the government may not conceal indictments indefinitely.  *United States v. Sharpe*, 995 F.2d, 49, 51 n.5 (5th Cir. 1993).  Yet here the prosecutors perpetuated the seal even after delay exceeded the one-year presumptive prejudice threshold, by which time it was clear beyond any doubt that Mr. Khoury was not traveling.  Therefore, either sealing was ineffective to toll the statute of limitations from the outset, or the limitations period began to run anew once delay became presumptively prejudicial.  In either case, the remaining charges in the Indictment, which are based on events occurring decades ago, are time-barred.

4

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Samir Khoury

The events underlying the charges in the Indictment began to unfold nearly 30 years ago. Mr. Khoury, a native of Lebanon, resided there from the time of his birth in 1954 until 1971 when he came to the U.S. to attend college.  While attending engineering school in Cleveland, he became a naturalized U.S. citizen.  Mr. Khoury left the U.S. in 1977 to work overseas in sales for Houston-based M.W. Kellogg ("Kellogg").  From 1977 until 1988, he was primarily involved in obtaining engineering, procurement, and construction ("EPC") contracts for Kellogg in the Middle East and Africa.  In 1983, Mr. Khoury, then stationed in Dubai, began reporting to Jack Stanley, who was the company's Far East Vice President of Sales.

Mr. Khoury resigned from Kellogg in 1988 to pursue a career as a consultant, offering his expertise to firms worldwide.  He was retained by Kellogg, and later its successor Kellogg Brown & Root ("KBR"), to represent those companies in the pursuit and performance of liquid natural gas ("LNG"), ethylene, and petrochemical production projects in the Middle East, Africa, and the Far East.  Indictment ("Ind.") ¶¶ 1-2.  LNG projects are particularly complex and "the number of contractors experienced and qualified to carry out an LNG project is limited, on the order of 6-7."  *See Understanding Natural Gas and LNG Options*, U.S. Dep't of Energy (Nov. 2016) at 96, *available at* http://www.energy.gov/sites/prod/files/2016/12/f34/Understanding Natural Gas and LNG Options.pdf.  Design and construction costs for LNG plants range from hundreds of millions to billions of dollars.  *Id.* at 92-98, 171-72.  As a result of Mr. Khoury's efforts in locating and developing projects that were awarded to Kellogg/KBR, the consulting firms that employed him earned millions of dollars in fees.  Ind. at ¶¶ 5-6.

In 2003, Mr. Khoury moved to Dubai to support ongoing KBR projects in the Middle East.  In 2004, he returned to his home in Lebanon, and has lived in or near Beirut ever since.

5

**B.      The Government's Investigation and Official Smearing of Mr. Khoury**

In 2004, the DOJ and the Securities and Exchange Commission initiated a Foreign Corrupt Practices Act ("FCPA") investigation focused on LNG projects in Nigeria awarded to a joint venture formed by KBR and three other contractors in 1991. *See* Halliburton Co. Annual Report (Form 10-K) (March 8, 2004) at 54, *available at* http://services.corporate-ir.net/SEC.Enhanced/SecCapsule.aspx?c=67605&fid=2655253. The government's investigation continued for at least eight years, producing indictments, guilty pleas, and other highly publicized dispositions. In 2006, at the request of the DOJ, Mr. Khoury came to the U.S. to be interviewed. His former U.S. lawyer was in contact with the DOJ until 2007, and thereafter undersigned counsel maintained contact with the prosecutors.

In September 2008, former KBR CEO Jack Stanley pleaded guilty to one count of conspiracy to violate the FCPA in connection with the Nigeria LNG projects. *United States v. Albert J. Stanley*, Crim. No. H-08-597 (KPE) (S.D. Tex. Sept. 3, 2008) (Plea Agreement at ¶ 22) [Dkt. 9]. Stanley also pleaded guilty to a second charge (Count Two) of conspiracy to commit mail and wire fraud in connection with "kickbacks" allegedly paid to Stanley by an unindicted "LNG Consultant" on the Nigeria projects and other named LNG projects. *Id*. According to the Factual Basis for the Guilty Plea, Stanley "caused" KBR to enter into consulting contracts with the "LNG Consultant" and various affiliated companies on certain LNG projects, and the "LNG Consultant" then "kicked-back" a portion of his consulting fees to Stanley. *Id*. at ¶¶ 22m-22o.

The DOJ description of the "LNG Consultant" in the Stanley plea documents, and in the prosecutor's representations in open court, identified Mr. Khoury in all respects except by name. The LNG Consultant was described as "a citizen of the United States and of Lebanon" who was a "salesperson employed by EPC Contractor A [identified as Kellogg by the DOJ a few months later when KBR entered its plea] responsible for LNG and other projects in the Middle East"

6

from "in or about 1977, until in or about 1988." Stanley Information at ¶ 19. Count Two further alleged that "in or about 1988, LNG Consultant resigned from EPC Contractor A and became a Consultant to EPC Contractor A and subsequently EPC Contractor A1" (identified as KBR a few months later when it plead guilty). *Id.* According to the government's allegations, the LNG Consultant formed a "Lebanese Consulting Company" that was awarded a contract by KBR in Malaysia. *Id.* at ¶ 24a. Count Two also alleged that the LNG Consultant was awarded consulting contracts for other LNG projects in Nigeria, Malaysia, Egypt, Yemen, and Indonesia. *Id.* at ¶¶ 24c-24j. This detailed description of the LNG Consultant in the Stanley plea documents could *only* refer to Mr. Khoury; no other person in the LNG industry possesses these same personal and biographical characteristics.[1]

During the September 3, 2008 plea hearing, the prosecutor further referred to the LNG Consultant as "a dual U.S. and foreign national" and a "potential defendant[]." Sept. 3 Hearing Tr. at 15. The Court (Ellison, J.) immediately recognized that the descriptive information revealed by the government could identify potential defendants and asked: "Is this something that needs to be sealed?" *Id.* at 15-16. The prosecutor, however, declined the Court's invitation to seal the government's pleadings and colloquy, ensuring that the uniquely-descriptive details identifying Mr. Khoury remained public. The prosecutor then sought postponement of Stanley's sentencing to allow for his cooperation against "potential defendants, targets, both here and abroad" in the government's "ongoing" investigation. *Id.* at 12, 15.

In November 2008, undersigned counsel contacted the DOJ to report information that Mr. Khoury had received from another potential witness who also resided in Lebanon. Counsel offered to make Mr. Khoury available for interview in Lebanon regarding that information, but

---

[1] Unrebutted witness testimony, as well as the government's own pleadings, demonstrate that *only* Mr. Khoury could be the accused LNG consultant. *See* infra at 18-20.

the DOJ declined this offer.  Significantly, the prosecutors did not notify counsel that Mr. Khoury was a target of the government's investigation, much less that he had already been charged.  Mr. Khoury and his counsel would not learn until July 2018 that the prosecutors had procured an indictment of him at the very time he was offering to be interviewed.

Within months of the Stanley guilty plea, two U.K. nationals who acted as agents for KBR on the Nigeria projects, Jeffrey Tesler and Wojciech Chodan, were indicted for violations of the FCPA, *United States v. Tesler, et al.*, Crim. No. H-09-098 (KPE) (S.D. Tex. Feb. 17, 2009) (unsealed Mar. 5, 2009) [Dkt. 1], and subsequently pleaded guilty.  *Id.* at Dkt. Nos. 34 (Tesler), 23 (Chodan).  Both Tesler and Chodan were residing overseas at the time they were indicted, but the DOJ prosecutors did not seek to keep the indictment charging them under seal.

At the same time, the DOJ charged KBR with FCPA violations.  *See United States v. Kellogg Brown & Root, LLC*, Crim. No. H-09-071 (KPE) (S.D. Tex. Feb. 11, 2009) (Plea Agreement) [Dkt. 12].  Over the next three years, each of the KBR's joint venture partners pleaded guilty to violations of the FCPA, or entered into a deferred prosecution agreement, in connection with the Nigeria projects.  *See United States v. Technip S.A.*, Crim. No. H-10-439 (KPE) (S.D. Tex. June 28, 2010) (DPA) [Dkt. 1-1]; *United States v. Snamprogetti Netherlands B.V.*, Crim. No. H-10-460 (KPE) (S.D. Tex. July 7, 2010) (DPA) [Dkt. 3]; *United States v. JGC Corp.*, Crim. No. 11-CR-260 (KPE) (S.D. Tex. April 6, 2011) (DPA) [Dkt. 4].  Mr. Khoury was never charged or otherwise publicly accused by the government of violating the FCPA.

### C.    Mr. Khoury's First Attempt to Obtain Notice of Any Charges

Throughout this lengthy period of prosecution activity, neither Mr. Khoury nor his counsel was contacted by the DOJ regarding the KBR investigation or related matters.  In October 2014, undersigned counsel contacted DOJ prosecutors to confirm that the investigation

8

was closed as to Mr. Khoury.  Government counsel refused to respond to this inquiry or to several follow-up questions regarding whether Mr. Khoury was the subject of ongoing investigative activity, sealed charges, or an outstanding arrest warrant.  *See* October 22, 2014 Letter from Charles S. Leeper to Patrick F. Stokes, Exhibit A hereto.

In December 2014, undersigned counsel moved for the unsealing and dismissal of the indictment that he surmised was pending against Mr. Khoury under seal.  *United States v. Samir Khoury*, Misc. No. 4:14-mc-02884 [Dkt. 1].  Without acknowledging that charges existed, the DOJ objected to Mr. Khoury receiving notice of the sealed charges, arguing that the Court lacked authority to unseal an indictment.  *See* Feb. 4 Hearing Tr. at 5-6.  The prosecutor proposed to make a proffer to the Court "in an *ex parte* hearing."  *Id*.  Counsel requested that any such proffer identify the reasons for sealing, steps taken to monitor the continued validity of those reasons, and the need for continued sealing.  *See* Samir Khoury's Post-Hearing Brief, Misc. No. 4:14-mc-02884 [Dkt. 15] at 3.  We do not know whether any proffer was actually made.

In an Order issued February 19, 2015, the Court denied Mr. Khoury's motion to dismiss, and directed that all the pleadings, transcripts, and "related documents" remain sealed.  Misc. No. 4:14-mc-02884 [Dkt. 16].  There is no indication in the text of the Order that the Court reached the merits of Mr. Khoury's Speedy Trial and statute of limitations arguments.  *See id.*

Mr. Khoury appealed the February 19 Order, *see Sealed Appellee 1 v. Sealed Appellant 1*, No. 15-98003 (5th Cir. 2015), and the government moved to dismiss it for lack of appellate jurisdiction.  Motion by Sealed Appellee 1 to Dismiss Appeal for Lack of Appellate Jurisdiction [Case No. 15-98003, Doc. No. 00512997618].  The government contended that the indictment Mr. Khoury sought to have unsealed "***was not known to exist***," *id.* at 1, but nevertheless argued that appellate review of the Speedy Trial and statute of limitations issues must await unsealing of

the indictment, trial, and conviction. *Id.* at 3. On May 20, 2015, in a *per curiam* opinion, the Fifth Circuit granted the government's motion to dismiss Mr. Khoury's appeal.

### D.   August 2015 *Briggs* Action

In August 2015, Mr. Khoury, as "John Doe," filed a civil complaint seeking declaratory relief and expungement from court records of the government's public accusations against him in *Stanley*. *See Doe v. United States*, No. H-15-02414 (Aug. 20, 2015). Relying on *United States v. Briggs*, 514 F.2d 794 (5th Cir. 1975) and its progeny, Mr. Khoury sought a determination that the government had violated his Due Process rights by identifying him as a co-conspirator in *Stanley* without affording him a public forum for vindication. *See* No. H-15-02414 [Dkt. 1]. The government moved to dismiss, contending that sovereign immunity barred Mr. Khoury's claims, that the claims were untimely, and that he failed to state a claim for relief. *See* No. H-15-02414 [Dkt. 9]. In a June 30, 2016 Opinion, the District Court (Hittner, J.) rejected the government's immunity defense, but dismissed the *Briggs* claim on limitations grounds, reasoning that it accrued in 2008, "as soon as the Government identifie[d] and accuse[d] [Doe] as a criminal co-conspirator." *Doe v. United States*, 197 F. Supp. 3d 933, 938 (S.D. Tex. 2016).

On appeal, the Fifth Circuit recognized that the government had improperly identified Mr. Khoury as Stanley's co-conspirator without affording Mr. Khoury a public forum in which to vindicate his rights. *See* supra at 2. The Fifth Circuit, however, affirmed the ruling below denying Mr. Khoury's claim on statute of limitations grounds. *Doe*, 853 F.3d at 792.

### E.   Mr. Khoury's Second Attempt to Obtain Notice of Any Charges

In September 2017, Mr. Khoury filed a second motion to unseal and dismiss the indictment that counsel surmised was pending against Mr. Khoury under seal. *United States v. Samir Khoury*, Misc. No. 4:17-mc-02553 (Sept. 29, 2017) [Dkt. 1]. The government's

opposition reprised the arguments it made in successfully thwarting Mr. Khoury's 2014 motion to unseal and dismiss. *Id.* [Dkt. 13]; *see also* Mar. 22, 2018 Hearing Tr. at 18 ("Mr. Khoury seeks … to unseal … an alleged indictment **that he does not know to exist**") (emphasis added). Indeed, the government insisted that it could prevent unsealing if Mr. Khoury were before the Court seeking such relief again ten years hence. Mar. 22, 2018 Hearing Tr. at 18.

In an Order dated June 11, 2018, the Court rejected the government's position that Mr. Khoury was a "fugitive" from an indictment he did not know to exist, *United States v. Khoury*, No. 4:17-MC-2553, 2018 WL 2864413, at *3 (S.D. Tex. June 11, 218), but granted the government's request to show *ex parte* any grounds for continued sealing. *Id.* at *5. The government was unable to make any such showing, *see Ex Parte* Notice of Government's Withdrawal of Opposition to Unsealing the Indictment, No. 4:17-mc-02553 [Dkt. 23], and the Court unsealed the Indictment. July 9, 2018 Order [Dkt. 25].

Next, the government insisted that it should not be required to respond to the merits of Mr. Khoury's Speedy Trial and limitations arguments because he was **still** a fugitive. The Court permitted the government to brief the fugitive disentitlement issue once again, and Mr. Khoury to respond. *See* Crim. No. 4:08-cr-763 [Dkt. 16], [Dkt. 17]. The Court entertained argument in a November 29, 2018 hearing, at the conclusion of which the Court again "decline[d] to apply the fugitive disentitlement doctrine." November 29, 2018 Minute Entry.

###   F.   The Record of the Government's "Diligence"

The government initially declined to comply with Mr. Khoury's request for records evidencing any government efforts to locate and apprehend him. Government Response to Motion to Compel [Dkt. 28] at 6. The Court first directed the government to produce these records for *in camera* inspection, *see* January 10, 2019 Minute Entry, then ordered the

production to Mr. Khoury of specified information contained in those records, a description of government policies prescribing actions to apprehend defendants located in a foreign country, and information regarding such efforts taken in similar prosecutions.  *See* March 13 Order at 2.

The information produced by the government shows that the government made only token efforts to apprehend Mr. Khoury before he moved to dismiss the Indictment in 2014; it did not notify Lebanon that Mr. Khoury was a wanted person until after the Indictment was unsealed; and it consciously chose to deny him notice of the charges filed against him.

More specifically, the compilation of information produced in response to the March 13 Order revealed that, in the *six years* between the time Mr. Khoury was indicted under seal in November 2008, and the filing of his first motion to unseal and dismiss the Indictment in December 2014, the government made *one inquiry* to other countries regarding Mr. Khoury. *See* April 12, 2019 Log ("Government Log"), attached as Exhibit B hereto, at 3 (showing Diffusion Notice sent by Interpol Washington on May 7, 2009 to "12 Foreign Interpol Counterparts").[2]  The Government Log does not identify the criteria by which the 12 Foreign Interpol Counterparts were selected.  It is notable, however, that in 2009 a traveler from Beirut, Lebanon could fly direct to each of the twelve countries that received the Diffusion Notice.

---

[2] A Diffusion Notice is a less formal alternative to an Interpol "Red Notice" that may be used to obtain international cooperation in locating, arresting and detaining a wanted subject.  *See* Peter M. Thomson, *Interpol's Transnational Policing By "Red Notice" and "Diffusions": Procedural Standards, Systemic Abuses, and Reforms Necessary to Assure Fairness and Integrity*, Engage: Volume 16, Issue 2, at 22 (July 2015), *available a*t https://fedsoc.org/commentary/publications/interpol-s-transnational-policing-by-red-notice-and-diffusions-procedural-standards-systemic-abuses-and-reforms-necessary-to-assure-fairness-and-integrity.  Under the Interpol system, a requesting country may limit the distribution of a Diffusion Notice to select countries or police organizations of its choice.  *Id.*  According to the Government Log, that is what the DOJ did here.  Upon inquiry by undersigned counsel, government counsel confirmed that the two entries for May 7, 2009 are duplicative and only one Diffusion Notice was sent that date.  Similarly, the three entries for March 10, 2015 are also duplicative and refer to the sending of a single Diffusion Notice.  Government counsel also provided the names of each of the 12 foreign countries that received the DOJ Diffusion Notice.

Within days, the DOJ received responses from two of the "Interpol Counterparts." *Id.* (May 10 and May 20, 2009 entries). Through these responses, as well as from the fact no responses were received from the other ten selected Interpol Counterparts, DOJ could discern that Mr. Khoury was not traveling outside of Lebanon. The DOJ, however, ***took no further action for nearly six years***. In March 2015, six months after Mr. Khoury filed his first motion to unseal and dismiss, see Misc. No. 14-2884 (KPE), the DOJ merely renewed its Diffusion Notice. *See* Government Log, Exhibit B, at 3 (March 10, 2015 entries). The government then sat on its hands again for ***nearly four more years***. *Id.* (January 2019 entries).

Upon inquiry by undersigned counsel, government counsel confirmed that the Diffusion Notices were **not** sent to Lebanon. *Id.* It is also evident from the Government Log and accompanying April 12, 2019 letter that the DOJ did not notify Lebanon of the charges against Mr. Khoury until January 14, 2019 when DOJ issued its first Red Notice. *Id.*[3] The government production is silent regarding whether the U.S. has asked Lebanon to extradite Mr. Khoury.

The government production does not include any contemporaneous documentation of the DOJ decisions to neither pursue extradition of Mr. Khoury nor notify him of the charges so that he could timely confront them. If no such documentation exists, the failure to prepare it violates DOJ policy. *See* U.S. Department of Justice Manual (2018 ed.), § 9-15.100, *available at* https://www.justice.gov/jm/jm-9-15000-international-extradition-and-related-matters#9-15.100 ("All decisions to pursue or not to pursue extradition or other measures to obtain custody of the fugitive should be documented to prepare for any eventual speedy trial motion").

---

[3] As explained in Mr. Khoury's February 25, 2019 Status Report on Motion to Compel Production of Information Necessary for Speedy Trial and Statute of Limitations Analyses [Dkt. 34], the DOJ's Red Notice caused Mr. Khoury to be detained and interrogated by Lebanese authorities.

Regarding the last two categories of information to be provided to Mr. Khoury pursuant to the March 13 Order, the government contends that there is no "standardized" DOJ policy regarding efforts to apprehend a defendant located in a foreign country, and effectively concedes that there are no prosecutions similar to this one.  *See* April 12, 2019 DOJ Letter, Exhibit B, at 1-2.  Government counsel maintains that the decision on what steps to take to apprehend such individuals depends on "circumstances particular to the prosecution, to the defendant, and to the country where he or she may be located."  *Id.* at 1.  Not surprisingly, the government is unable to describe any other case where prosecutors, before charging an individual under seal, identified him publicly as an unindicted coconspirator, then concealed the charges from him for over a decade despite "know[ing] exactly where he is." *Khoury*, 2018 WL 2864413, at *4.

## III.   ARGUMENT

The government officially smeared Mr. Khoury in the September 2008 Stanley plea proceeding by accusing him of criminality without providing a forum for vindication, a Due Process violation long prohibited in this Circuit.  When the opportunity arose to provide that forum for vindication upon return of the Indictment just two months later, the government was required immediately to notify him of the charges and afford him the opportunity to contest them.  Instead, the prosecutors violated Mr. Khoury's Due Process rights ***again*** by causing the Indictment to be sealed indefinitely, also a prohibited practice in this Circuit.  Measured from the date of sealing until the Court's November 29, 2018 rejection of the government's disentitlement arguments, the delay caused by the government reached ***ten years and five days.***  Had the Court not intervened, the prosecutors were prepared to maintain the seal for another decade.

A delay of this duration is ***double*** that which has been found to be "extraordinary." *Barker*, 407 U.S. at 533.  A delay of only five years shifts the burden to the government to prove

"persuasively" that the defendant has not been prejudiced. *United States v. Bergfeld*, 280 F.3d 486, 491 (5th Cir. 2002) (citation omitted). "And such is the nature of the prejudice presumed that the weight [courts] assign to official negligence compounds over time as the presumption of evidentiary prejudice grows." *Doggett v. United States*, 505 U.S. 647, 657 (1992). Therefore, the intensity of the presumption warranted here is ***more than twice*** that which the government was unable to rebut in *Bergfeld*. Dismissal of the Indictment is "the only possible remedy." *Barker*, 407 U.S. at 522.

Furthermore, the Indictment is time-barred. The statute of limitations expired on Counts 2-3 and 9-10 well before the Indictment was returned. And, because sealing of the Indictment was improper *ab initio*, or at the very least was improper once the delay exceeded one year and became presumptively prejudicial to Mr. Khoury, the statute of limitations expired on the remaining charges in the Indictment no later than seven years ago.

### A.    Unsealing the Indictment Revealed Government-Caused Delay That Gives Rise to a Presumption of Prejudice, which the Government Cannot Rebut.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. This right is "fundamental," *Barker*, 407 U.S. at 515 & n.2, and "generically different than any of the other rights enshrined in the Constitution for the protection of the accused." *Id.* at 519. The right "attaches at the time of arrest or indictment, whichever comes first, and continues until the date of trial." *McCoy*, 786 F. Supp. 2d at 1223 (citation and internal quotation marks omitted). Thus, the Speedy Trial right accrues even if the indictment is sealed. *See Bergfeld*, 280 F.3d at 489 ("the [five-year] delay between the time Bergfeld was indicted and the time the indictment was unsealed … weighed heavily in Bergfeld's favor"); *United States v. Leaver*, 358 F. Supp. 2d 255, 268 (S.D.N.Y. 2004) ("witnesses are no less likely to die, nor their memories to dim, because an

indictment has been sealed").  Indeed, sealing places a higher burden on the government to exercise diligence.  *United States v. Heshelman*, 521 F. App'x 501, 506 (6th Cir. 2013) ("if a defendant is unaware of the indictment the government's burden is higher"); *United States v. Schlor*, No. CR-01-360-RHW, 2008 WL 4949037, at *1 (C.D. Cal. Nov. 14, 2008) ("the obligation to provide a speedy trial imposed on the Government is most clear because it alone knows of the charge").  The remedy for a Speedy Trial violation is dismissal of the indictment.  *United States v. Molina-Solorio*, 577 F.3d 300, 304 (5th Cir. 2009).

The Supreme Court has prescribed a four-factor test for Speedy Trial claims: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result."  *Doggett*, 505 U.S. at 651 (citing *Barker*, 407 U.S. at 530).  "[T]o trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay [of one year]."  *Id.* at 651-52.  Here, Mr. Khoury has shown delay **ten times longer** than that deemed sufficient to trigger the *Barker* analysis.

Where, on balance, the first three *Barker* factors weigh heavily in favor of the defendant, prejudice is presumed and the defendant is "relieved of the burden of demonstrating actual prejudice."  *Molina-Solorio*, 577 F.3d at 307.  Also, as noted above, in this Circuit a delay of five years or more between indictment and trial also triggers a presumption of prejudice that the government must then disprove.  *Bergfeld*, 280 F.3d at 489 (citing cases); *see also United States v. Brown*, 169 F.3d 344, 350 (6th Cir. 1999) (same); *United States v. Shell*, 974 F.2d 1035, 1036 (9th Cir. 1992) ("no showing of prejudice is required when the delay is great and attributable to

the government"). To overcome this presumption of prejudice, the government must "persuasively" rebut it. *Doggett*, 505 U.S. at 658.

As explained below, the *Barker* factors overwhelmingly favor Mr. Khoury, and the government cannot disprove the presumed prejudice to him caused by the decade of delay. Therefore, the Indictment must be dismissed.

### 1.   Pre-trial Delay of Ten Years Weighs Heavily in Mr. Khoury's Favor.

The first *Barker* factor, the length of delay, is significant to the Speedy Trial analysis because "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Doggett*, 505 U.S. at 652. "The longer the delay . . . the more heavily this factor is weighed against the Government." *McCoy*, 786 F. Supp. 2d at 1223. *Doggett* explained why:

> [I]mpairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." And though time can tilt the case against either side, one cannot generally be sure which of them it has prejudiced more severely. Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.

505 U.S. at 655-56 (internal citations omitted).

As noted above, the delay in this case is twice as long as that described by the Supreme Court as "extraordinary." *Barker*, 407 U.S. at 533. In this Circuit, delays of five years or more between indictment and trial weigh heavily in favor of the defendant. *See*, *e.g.*, *United States v. Cardona*, 302 F.3d 494, 497 (5th Cir. 2002) (delay of more than five years was "extraordinary" and weighed "heavily" in defendant's favor); *Bergfeld*, 280 F.3d at 489 (same). Thus, the extraordinary length of the delay at issue here weighs heavily in favor of Mr. Khoury.

17

2.      **The Government's Tactical Decision to Deny Mr. Khoury Notice of the Indictment, and Affirmative Actions to Prevent Unsealing, <u>Make the Government Solely Responsible for the Delay.</u>**

The second *Barker* factor requires the Court to analyze the reasons for the delay between indictment and trial.  *Barker*, 407 U.S. at 531.  The burden is on the government to justify any pretrial delay.  *McCoy*, 786 F. Supp. 2d at 1224 ("[a]ll of the circuit courts that have evaluated the reason for the delay element of the speedy trial analysis have held that the burden to explain the delay rests on the Government") (citations omitted).  Here too, the balance swings heavily in Mr. Khoury's favor.

       *a.*      *The Government was required to give Mr. Khoury immediate notice of the Indictment, having publicly accused him of criminality two months earlier while denying him a forum to contest the accusations, in violation of his Due Process rights.*

The government has steadfastly refused to admit that it unmistakably identified Mr. Khoury as Stanley's co-conspirator in the September 2008 plea proceeding.  According to the government, the Fifth Circuit's finding that prosecutors "accused [Khoury] of a crime without indicting him," *see Doe*, 853 F.3d at 800, was only an "assumption" and the true identity of the LNG Consultant remains in dispute.  Gov't Response in Opposition to Motion by Samir Khoury to Unseal and Dismiss Indictment at 5; March 22, 2018 Tr. at 22-24.  Unsealing, of course, has debunked the government's stubborn denials.

A comparison of the government's description of the "LNG Consultant" in the Stanley Criminal Information, with the factual allegations in the Indictment regarding Mr. Khoury and associated companies, confirms what the Fifth Circuit readily recognized before unsealing – that it ***was*** Mr. Khoury whom the government unlawfully smeared:

96105545.20

| Stanley Information | Khoury Indictment |
|---|---|
| "'LNG Consultant' was a citizen of the United States and a citizen of Lebanon." ¶19 | "Defendant SAMIR RAFIC KHOURY was a citizen of the United States and a citizen of Lebanon." ¶1 |
| "From in or about 1977, until in or about 1988, LNG Consultant was a salesperson employed by EPC Contractor A responsible for LNG and other projects in the Middle East." ¶19 | "From in or about 1977, until in or about 1988, KHOURY was an employee of The M.W. Kellogg Company ('Kellogg')." ¶1 |
| "In or about 1988, LNG Consultant resigned from EPC Contractor A and become a consultant to EPC Contractor A and subsequently EPC Contractor A1, among other firms." ¶19 | "In or about 1988, KHOURY resigned from Kellogg and become a consultant to Kellogg and subsequently Kellogg's successor, Kellogg, Brown & Root, Inc. ('KBR'), among other firms." ¶1 |
|  | "KHOURY paid Stanley kickbacks…from consulting fees that Kellogg had paid to a KHOURY-controlled consulting company in Lebanon (the 'Lebanese Consulting Company')" ¶7 |
| "On or about April 7, 1992, STANLEY signed the EPC Contractor A approval form authorizing a $15 million consulting agreement between EPC Contractor A and a company designated by LNG Consultant ('Lebanese Consulting Company') for an LNG project in Malaysia." ¶24a | "On or about April 7, 1992, Stanley signed the Kellogg approval form authorizing the $15 million consulting agreement between Kellogg and the Lebanese Consulting Company in connection with an LNG project in Malaysia." ¶11d[4] |

We challenge the government to locate *anyone*, other than Mr. Khoury, who meets the description of the LNG Consultant accused in the Stanley plea.

That the government identified Mr. Khoury during the Stanley plea proceedings as the "LNG Consultant" was well-understood in the LNG industry. Testimony taken in the *Doe* civil action, before it was dismissed on limitations grounds, confirmed that it was well known throughout the industry that Mr. Khoury was the accused "LNG Consultant." For example, Greg Trostel was employed by Kellogg/KBR as an engineer, and he worked with Mr. Khoury as KBR's primary consultant in the Middle East. *See* Trostel Deposition Excerpts, Exhibit C, at 41-45, 52-57. Mr. Trostel testified that the description of the "LNG Consultant" in the Stanley

---

[4] Nearly identical allegations are made in the Information (¶¶24c, f, h and i) and the Indictment (¶¶11gg, jjj, ooo, and xxx), respectively, regarding projects awarded to companies associated with Mr. Khoury in Nigeria, Egypt, Yemen and Indonesia.

19

Information fit Mr. Khoury *only*, and it was widely understood in the LNG industry that the government had accused him of a crime in the Stanley plea. *Id.* at 72-75.

Similarly, Guy Gerro was an engineer who performed consulting work on EPC projects for KBR and other large companies in the Middle East and Far East. *See* Gerro Deposition Excerpts, Exhibit D, at 10-17. Mr. Gerro worked with Mr. Khoury both when he was an employee of KBR and after he became a consultant. *Id.* at 36-46. When Stanley entered his guilty plea in September 2008, Mr. Gerro obtained copies of the plea documents that were available via the internet. *Id.* at 58-62. Mr. Gerro testified that the "LNG Consultant" described in the Stanley plea documents was Mr. Khoury and that "nobody fits that description except Samir Khoury." *Id.* at 62. Mr. Gerro spoke to other individuals who worked in the LNG industry who recognized Mr. Khoury as the "LNG Consultant." *Id.* at 62-64.

The relevant facts are incontrovertible. Nor is there anything "assumed" or equivocal in the Fifth Circuit's finding in *Doe* that the government's accusation of Mr. Khoury, without indicting him, violated his Due Process rights. 853 F.3d at 800. Indeed, it has been clear in the Fifth Circuit for over forty years that the government may not "publicly brand" a person as an unindicted co-conspirator while denying him a forum to clear his name. *Briggs*, 514 F.2d at 803-08 ("the scope of due process afforded … was not sufficient"); *see also United States v. Holy Land Found. for Relief & Dev.*, 624 F.3d 685, 688 (5th Cir. 2010) (citing cases).

Having violated Mr. Khoury's Due Process rights in September 2008, the government compounded the violation two months later when it caused the sealing of the Indictment, once again preventing him from confronting the accusation that he paid kickbacks to Stanley. The effect of the sealing "was to leave [Khoury] hamstrung in [his] ability to mitigate the damage done by [his] public identification as a possible coconspirator in the activities of [Stanley]."

*Holy Land Found.*, 624 F.3d at 690.  The prospect that Mr. Khoury might be able to contest the

charges at some indefinite point in the future was meaningless, because "vindication of '[t]he

fundamental requirement of due process is the opportunity to be heard at a ***meaningful time*** and

in a meaningful manner.'"  *Doe*, 853 F.3d at 801 n.42 (quoting *Mathews v. Eldridge*, 424 U.S.

319, 333 (1976)) (emphasis added).  Therefore, sealing of the Indictment was improper *ab initio*.

> ### b.  At the very least, the Government was obliged to give Mr. Khoury notice of the charges once pre-trial delay approached one year and became presumptively prejudicial.

The official smearing of Mr. Khoury two months before the Indictment was returned,

combined with the government's knowledge that he had not traveled to the U.S. for many years,

made ***any*** delay in notifying him of the charges unreasonable.  *See*, *e.g.*, Nov. 19, 2018 Hearing

Tr. at 7 (prosecutor representing that according to government travel records Mr. Khoury

stopped traveling to the U.S. in February 2004).  But, even assuming, *arguendo*, that the

government could justify sealing of the Indictment for a short time to attempt to arrest Mr.

Khoury by surprise, that justification lost any validity as pre-trial delay approached one year.

As noted above, when pre-trial delay approaches one year it becomes presumptively

prejudicial.  *McCoy*, 786 F. Supp. 2d at 1223 (quoting *Doggett*, 505 U.S. at 652).  In *Heshelman*,

the government adopted the same lying-in-wait strategy that the prosecutors employed here—

sealing the indictment in the hope of arresting the defendant when he returned to the United

States.  521 F. App'x at 506.  The Sixth Circuit determined that this strategy lost any legitimacy

"once the wait became presumptively prejudicial [when] the intentional delay by the government

was no longer justifiable."  *Id.* at 509.  In making this determination, the Sixth Circuit also

observed that "[t]he government's strategy of waiting for Heshelman to return to the United

States is even more troubling given … that the last record of Heshelman's presence in the United

States was in January of 2004, two years before the indictment"). *Id.* As a result, the Sixth

Circuit concluded that the second *Barker* factor weighed "heavily" against the government. *Id.*

As in *Heshelman*, the government knew when the Indictment was returned that Mr.

Khoury was living overseas and had not traveled to the U.S. for several years. Furthermore, the

government's recent "due diligence" production proves that the prosecutors knew in 2009 that he

continued to reside in Lebanon and was not traveling. *See* § II.F., supra. After a year of lying in

wait without result, sealing of the Indictment could no longer be justified, and the government

should have notified Mr. Khoury of the charges and given him the opportunity to contest them.

Numerous other courts have held that the government has a ***duty to notify*** a defendant of

charges when pre-trial delay becomes presumptively prejudicial or once it becomes evident that

the defendant cannot be arrested by surprise. *See*, *e.g.*, *United States v. Velazquez*, 749 F.3d 161,

181 (3d Cir. 2014) ("[the government] could have sent mail to [defendant's] PO box or sought

out a relative to relay a request that [he] turn himself in"); *United States v. Mendoza*, 530 F.3d

758, 763 (9th Cir. 2008) ("[a]fter *Doggett,* the government was required to make some effort to

notify [the defendant] of the indictment"); *Brown*, 169 F.3d at 350 ("[r]easonable diligence in

this case would have started with contacting Brown's attorney"); *United States v. Shelton*, 820 F.

Supp. 461, 466 (W.D. Mo. 1992) ("once an indictment is sealed … the government should

closely monitor the case and make determinations, on a continuing basis, of whether sealing the

indictment … is helping or hindering the arrest of the defendant"); *United States v. Judge*, 425 F.

Supp. 499, 502 (D. Mass. 1976) ("[the government] could have mailed a copy of the indictment

to the defendant, or otherwise notified him … and requested his voluntary return to the [U.S.]").

It should have been evident to the government no later than November 2009 (one year

after the Indictment was sealed) that its strategy of waiting for Mr. Khoury to travel to the U.S.

was ill-conceived and unlikely to succeed.  Yet the prosecutors "made no serious effort to test their progressively more questionable assumption" that they could arrest Mr. Khoury while he was traveling.  *Doggett*, 505 U.S. at 652-53.

>    **c.    Because the Government's concealment of the Indictment violated Due Process, and was both deliberate and persistent, the delay resulting from the sealing weighs heavily against the Government.**

In *Barker*, the Supreme Court instructed that "different weights should be assigned to different reasons [for delay]."  407 U.S. at 531.  For example, where the government acts (or fails to act) in **deliberate** fashion, the delay will weigh "heavily against the government."  *Id.*; *see also Heshelman*, 521 F. App'x at 509 (government's deliberate delay in notifying defendant living overseas fell "on the side of the impermissible").  In weighing this factor, courts also consider when the underlying conduct occurred.  Thus if the indictment was not returned until the limitations period is nearly expired, the government is held to a "heightened burden of urgency" to locate the defendant and notify him of the charges.  *Leaver*, 358 F. Supp. 2d at 270; *see also Bergfeld*, 280 F.3d at 491 n.3 ("we find it significant … that had the government waited to indict Bergfeld until the date it unsealed his indictment … it would have been limitations barred").  Here, the Indictment was not returned until nearly five years after the last alleged overt act, and it remained sealed until nearly fifteen years after the last alleged overt act.

The indefinite sealing of the Indictment was not merely negligent, it was **deliberate** and calculated.  *See*, *e.g.*, *United States v. Heckler*, 428 F. Supp. 269, 273 (S.D.N.Y. 1976) ("the decision of the government to seal this indictment…was certainly an intentional act by which it gained a tactical advantage to the prejudice of the defendants").  There was no mystery about how to locate or contact Mr. Khoury.  As explained above, the DOJ prosecutors were in communication with his U.S. counsel before and after the Indictment was sealed, and knew that Mr. Khoury was living openly in Lebanon and not traveling to the U.S.  *See also Khoury*, 2018

96105545.20

WL 2864413 at *4 ("the Government knows exactly where he is").  The government, however, apparently wanted to arrest Mr. Khoury on *its* terms, rather than giving him notice of the charges and the opportunity to appear voluntarily in the United States.

    As time passed and it became clear beyond any doubt that Mr. Khoury was not traveling, indefinite sealing of the Indictment was even more inexcusable.  *See Heshelman*, 521 F. App'x at 508-09 ("[the government's] willingness to wait for an indefinite period of time to fulfill that desire [to arrest by surprise] is inconsistent with the dictates of the Sixth Amendment").  At each decision point—in November 2009 after one year of sealing when delay became presumptively prejudicial, in October 2014 when Mr. Khoury's counsel asked prosecutors about his status, in December 2014 when he moved to unseal, and in September 2017 when he again sought unsealing—the government *chose* to keep the Indictment sealed.  As a practical matter, the DOJ foreclosed any prospect of a speedy trial.  Therefore, the decade of delay from the November 2008 sealing until November 2018, when the Court ruled the government must answer Mr. Khoury's Speedy Trial arguments, weighs heavily against the government.

> **d.**    **Because the government-caused delay was negligent at the very least, and the length of the delay is extraordinary, this factor weighs against the government.**

    In the Speedy Trial analysis, even negligence must be weighed against the government "since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."  *Barker*, 407 U.S. at 531.  In such "middle-ground" cases, where the government's action (or lack thereof) falls somewhere between diligent prosecution and bad faith, "'the weight assigned to the factor increases as the length of the delay increases.'"  *Molina-Solorio*, 577 F.3d at 305.  For this reason, in cases like this one where the delay is "extraordinary," mere negligence on the part of the government in bringing the defendant to trial

24

creates a presumption of prejudice that the government must persuasively rebut. *Doggett*, 505 U.S. at 657-58; *see also Bergfeld*, 280 F.3d at 491.

Even if the Court concludes that the government's delay was not part of a deliberate plan, a finding of gross negligence is clearly warranted on this record. After conducting a four-year long investigation, the government knew (or should have known) at the time the Indictment was returned that Mr. Khoury was not traveling outside of Lebanon. As explained in Section II. F. above, the DOJ waited more than five months after the Indictment was returned before sending a perfunctory notice to "12 Foreign Interpol Counterparts"—but not to Lebanon—of the DOJ's interest in Mr. Khoury. The two responses that DOJ received, and the absence of any response from the other selected recipients, confirmed that Mr. Khoury was not traveling. Not only did the DOJ not follow up with these Interpol Counterparts, it ***took no further action for nearly six years***. It was only after the filing of Mr. Khoury's first motion to unseal and dismiss the Indictment that the DOJ renewed its "Diffusion Notice" by sending it to the same 12 Foreign Interpol Counterparts. The DOJ then waited ***almost four more years*** before finally notifying its counterparts in Lebanon of the charges against Mr. Khoury. These desultory and episodic efforts were even less diligent than the "concentrated bursts between which little to no action was taken" found by this Court to be grossly negligent in *McCoy*. 786 F. Supp. 2d at 1225.

This case is very much like *Mendoza*, which reversed the defendant's conviction on Speedy Trial grounds where an eight-year delay was due to the government's failure to exercise diligence. 530 F.3d at 763-65. Like Mr. Khoury, Mendoza no longer lived in the U.S. when the indictment was returned but the government knew how to contact him. *Id*. at 761. Instead of contacting him, "the government simply put a warrant out on the law enforcement database so that Mendoza would be detained when he returned to the [U.S.]." *Id*. at 762. The Ninth Circuit

held that entering a warrant in government databases was not reasonable diligence, "the government was negligent when it failed to attempt to inform Mendoza of the indictment," and the delay created a presumption of prejudice that the government could not rebut. *Id*. at 763-64*; see also Brown*, 169 F.3d at 351 ("extraordinary" 5-year delay and government negligence in failing to notify defendant's attorney of indictment created presumption of prejudice); *McCoy*, 786 F. Supp. 2d at 1227 ("[g]overnment's gross negligence combined with significant [3 year] delay … weigh heavily in McCoy's favor such that he should be relieved of the burden of demonstrating actual prejudice").

"[R]easonable diligence" demands "serious efforts." *Doggett*, 505 U.S. at 652, 656; *see also Velazquez*, 749 F.3d at 180 (checking databases 8 times in 5 years, and placing defendant on "most wanted list," were negligible efforts and could not be deemed "'serious' in any circumstances"). Here, the DOJ selectively issued a perfunctory notice that Mr. Khoury was a wanted person *just once in the six years* after the Indictment was sealed. Had the government been serious about its affirmative constitutional obligation to afford Mr. Khoury a Speedy Trial, the prosecutors would have notified him of the charges and allowed him to confront them when important witnesses and documents were still available. Its failure to do so was, at the very least, grossly negligent. Therefore, the second *Barker* factor weighs heavily in Mr. Khoury's favor.

### 3.     Mr. Khoury's Prompt Assertion of His Sixth Amendment Speedy Trial Rights Weighs Heavily in His Favor.

The third *Barker* factor, whether the defendant timely asserted his Speedy Trial right, also weighs heavily in Mr. Khoury's favor. He sought unsealing at the earliest indication that he *might* have been indicted, *see* supra at 8-9, and made extraordinary efforts to overcome the government's resistance to judicial consideration of his Speedy Trial rights. Our research has revealed no case where a defendant exercised the level of diligence displayed by Mr. Khoury.

Incredibly, the government has contended that "[d]efendant is responsible for the lengthy delay in this matter." *See* Government's Request to Deny Defendant's Motion to Dismiss the Indictment [Dkt. 16] at 13. The Court rejected this contention in denying the government's request for application of the Fugitive Disentitlement Doctrine, *see* November 29, 2018 Minute Entry, and there is no reason to credit it in the context of the Speedy Trial analysis.

Indeed, this Court, the Fifth Circuit, and many other courts have rejected the same "blame-the-defendant" argument in weighing the *Barker* factors. In *McCoy*, the defendant was arrested and released on a firearms charge but was not indicted until nineteen months later. 786 F. Supp. 2d at 1218-20. In granting defendant's motion to dismiss for the three-year delay in bringing him to trial, this Court attributed the entirety of the delay to the government, even though defendant knew that he was under investigation for the firearms violation. *Id.* at 1226 ("a defendant is not charged with asserting this right until he is notified of the pending charges"). Similarly, in *Molina-Solorio*, the defendant was charged with escape and, after being apprehended, moved to dismiss the indictment on Speedy Trial grounds. 577 F.3d at 301. The Fifth Circuit reasoned that, although he could have surmised he was being pursued, "the law does not require Molina-Solorio to assume the existence of, and ask for a speedy trial on, a charge he is not actually aware of." *Id.* at 306. *See also Velazquez*, 749 F.3d at 179 ("Velazquez had no duty to bring on his own trial [and] his lawyer's inquiry does not diminish any governmental negligence in failing to pursue him, or even to contact his lawyer again").

Other courts have followed this same reasoning in granting Speedy Trial motions by defendants who, while living outside the U.S., knew of an investigation but not an indictment. *See*, *e.g.*, *Heshelman*, 521 F. App'x at 509 ("[t]here is no evidence that Heshelman knew either that charges had been filed against him or that the government had concluded its investigation …

and found him criminally culpable"); *Mendoza*, 530 F.3d at 763 ("Mendoza was unaware of the indictment so he did not know that he needed to return.  And it was not Mendoza's responsibility to contact the government during the investigation"); *Brown*, 169 F.3d at 349 ("we find equally unpersuasive the government's reliance on Brown's alleged attempt to evade authorities … before the indictment was unsealed") (internal quotations omitted); *Leaver*, 358 F. Supp. 2d at 269 ("Leaver was conscious … that he was being investigated criminally [but] I am not persuaded that he made efforts to conceal himself").  The principle recognized in these decisions is that knowledge of an investigation is not actual notice of charges, and a suspect's continuation of his life routine in a foreign country does not render him responsible for pre-trial delay.

In this case, the government's wait-and-see strategy relegated Mr. Khoury and his counsel to speculating about whether and when Mr. Khoury had been indicted.  Nevertheless, Mr. Khoury promptly asserted his Speedy Trial rights in December 2014 upon obtaining the first indication that he *might* have been indicted.  In these circumstances, it cannot be seriously disputed that the third *Barker* factor weighs heavily in Mr. Khoury's favor.

### 4.   Mr. Khoury Need Not Show That He Has Been Prejudiced by the Government's Delay Because Prejudice Is Presumed.

Because the first three *Barker* factors weigh heavily in Mr. Khoury's favor, prejudice is presumed.  *Molina-Solorio*, 577 F.3d at 307.  Alternatively, prejudice is presumed because the government-caused delay exceeded five years.  *Bergfeld*, 280 F.3d at 491 ("the five-year delay … entitles Bergfeld to a presumption of prejudice").  It is the government's burden to rebut the presumption "persuasively." *Doggett*, 505 U.S. at 658.  This burden is nearly impossible to satisfy because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* at 655; *see also id.* at 654 n.4 ("[the

government] has not, and probably could not have, affirmatively proved that the delay left [defendant's] ability to defend himself unimpaired").

A recent example of the government's inability to rebut the presumption of prejudice is *United States v. Whitlock*, 698 F. App'x 220 (5th Cir. 2017). Seven years elapsed before the government arrested Whitlock on drug charges. When he moved to dismiss the indictment on Speedy Trial grounds, the district court reasoned that the government had rebutted the presumption of prejudice by showing that recorded conversations of drug buys from Whitlock, and the undercover detective's testimony, were still available. *Id.* at 221. The Fifth Circuit reversed and dismissed the indictment, citing *Doggett's* reasoning that delay presumptively compromises trials in ways that cannot be identified, much less disproven. *Id.* at 222.

If the government was unable to rebut the presumption of prejudice from a seven-year delay in prosecuting recorded drug buys, there is *no* prospect that it could disprove prejudice from a decade of delay in bringing to trial an alleged fraud case based on events spanning between *sixteen* and nearly *thirty years* ago. For ease of reference, we list in the table below cases in which courts have presumed prejudice to the defendant and dismissed indictments on Speedy Trial grounds, in circumstances less compelling than those present here.

| Case | Length of Delay | Disposition |
|---|---|---|
| *Doggett v. United States*, 505 U.S. 647 (1992) | 8.5 years | Reversing judgment |
| *United States v. Whitlock*, 698 F. App'x 220 (5th Cir. 2017) | 7 years | Reversing judgment and dismissing indictment |
| *United States v. Molina-Solorio*, 577 F.3d 300 (5th Cir. 2009) | 10 years | Reversing judgment and dismissing indictment |
| *United States. v. Bergfeld*, 280 F.3d 486 (5th Cir. 2002)) | 5.3 years (indictment sealed) | Reversing judgment |
| *United States v. Cardona*, 302 F.3d 494 (5th Cir. 2002) | 5.5 years | Vacating judgment and dismissing indictment |

29

| Case | Length of Delay | Disposition |
|---|---|---|
| *United States v. McCoy*, 786 F. Supp. 2d 1216 (S.D. Tex. 2011) | 3 years | Motion to Dismiss on Speedy Trial grounds granted |
| *United States v. Heshelman*, 521 F. App'x 501 (6th Cir. 2013) | 3.25 years (indictment sealed) | Reversing judgment and dismissing indictment |
| *United States v. Brown*, 169 F.3d 344 (6th Cir. 1999) | 5.5 years | Affirming dismissal of indictment |
| *United States v. Shell*, 974 F.2d 1035 (9th Cir. 1992) | 6 years | Affirming dismissal of indictment |
| *United States v. Toma*, 869 F. Supp. 2d 1315 (D. Kan. 2012) | 6 years | Motion to Dismiss on Speedy Trial grounds granted |
| *United States v. Leaver*, 358 F. Supp. 2d 255 (S.D.N.Y. 2004) | 6 years (indictment sealed) | Motion to Dismiss on Speedy Trial grounds granted |

Where, as here, a presumption of prejudice is neither persuasively rebutted nor extenuated, "[t]he only remedy . . . is dismissal of the indictment." *Molina-Solorio*, 577 F.3d at 304.

### B. Even If the Court Concludes That Prejudice Need Not Be Presumed, Mr. Khoury Has Demonstrated That He Has Been Prejudiced by the Delay.

As the Supreme Court explained in *Smith v. Hooey*, the Speedy Trial guarantee is "essential to protect at least three basic demands of criminal justice in [our] legal system: (1) to prevent undue and oppressive incarceration prior to trial, (2) to minimize anxiety and concern accompanying public accusation, and (3) to limit the possibilities that long delay will impair the ability of an accused to defend himself." 393 U.S. 374, 377-78 (1969) (internal quotations omitted). "Of these forms of prejudice, 'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Doggett*, 505 U.S. at 654 (quoting *Barker*, 407 U.S. at 532).

Although Mr. Khoury has not been incarcerated, he indisputably has experienced the other two forms of prejudice enumerated above. During the Stanley plea and sentencing hearings Mr. Khoury was the victim of the government's public accusation of complicity in

30

criminal conduct.  The anxiety and reputational damage produced by those accusations must be considered in the Speedy Trial analysis.  *See* supra at 19-20 (testimony regarding knowledge of accusations in LNG industry).  As for the third and most serious form of prejudice, defense witnesses have died, at least some relevant documents have been lost, and Mr. Khoury's ability to testify has been impaired.

*Witnesses*:  As proffered during the March 22, 2018 hearing, since early 2009 at least a dozen KBR employees and agents knowledgeable about the LNG projects at issue, who could have provided exculpatory testimony, have died.  *See* Mar. 22, 2018 Hearing Demonstrative, No. 4:17-mc-02553 [Dkt. 21-1], copy attached as Exhibit E; *see also* Mar. 22, 2018 Hearing Tr. at 15 (The Court: "The delay has also meant the unavailability of witnesses and perhaps the failed memories of other witnesses").  Mr. Khoury is prepared to adduce evidence regarding these witnesses, including employment records and death certificates. "If witnesses die or disappear during a delay, the prejudice is obvious." *Barker*, 407 U.S. at 532.  And, the memories of those witnesses who remain available will be severely degraded by the passage of time.  *See, e,g. United States v. Fernandes*, 618 F. Supp. 2d 62, 73 (D.D.C. 2009) ("23-month delay has surely contributed to fading memories").

*Documents*:  The government's delay in notifying Mr. Khoury of the Indictment has also impaired his ability to ensure the preservation of critical documents.  For example, records memorializing the approval of Mr. Khoury's consulting agreements by KBR and its joint venture partners would demonstrate that Stanley did not "cause" these agreements to be awarded to Mr. Khoury as the Indictment alleges.  Rather, these records would prove that executives within KBR's management (other than Stanley), and KBR's partners, approved the retention of Mr. Khoury, and that at the time of the approval he had ***already performed*** the services for which the

consulting companies that employed him were due commissions. Some of these documents may have been lost or discarded in the regular course of business since KBR and its partners entered into plea agreements many years ago. *See*, *e.g.*, *Schlor*, 2008 WL 4949037, at *16 ("[c]ompanies and people normally destroy records after a period of time has passed.").[5] Memories faded by passage of time "mak[e] contemporary documents all the more important." *Id.* And, it is no answer that the government preserved the documents it selected during the investigation. *See*, *e.g.*, *Velazquez*, 749 F.3d at, 185 (recognizing, in analysis of fourth *Barker* factor, the difference between "preservation of evidence the government would rely on [and] the materials [defendant] might need to challenge the government's case").

**Mr. Khoury's Testimony**: Finally, the many years of delay caused by the government would adversely affect Mr. Khoury's ability to testify in his own defense. Because the Indictment is based on events that occurred as long ago as the late 1980's, jurors will likely be skeptical of his ability to recall important details of his conversations with Stanley and the executives who approved the award of the consulting contracts decades ago. The adverse impact of the passage of time on a defendant's ability to testify to the circumstances of the alleged offense is especially acute where *mens rea* is an important element of the offense. *Toma*, 869 F. Supp. 2d at 1321 (by delaying the prosecution of offense requiring proof of willfulness, "the government has diminished the defendant's ability to credibly testify to the circumstances of the alleged crime."). Here, state of mind is critical inasmuch as mail or wire fraud requires proof of "a conscious, knowing intent to deceive or cheat someone." Pattern Crim. Jury Instr. 5th Cir. 2.57 (2015).

---

[5] Records created by banks and other financial institutions are essential to an effective defense to charges of Mail and Wire Fraud, but Mr. Khoury may be unable to subpoena or otherwise obtain bank account records as the regular retention period for such documents has long passed. See, e.g., 31 C.F.R. § 1010.430(d) (requiring financial institutions to retain records for five years).

In sum, Mr. Khoury's ability to defend against these charges has been degraded by the significant passage of time since return of the Indictment, given that some of the alleged conduct occurred nearly 30 years ago.  As noted, when the government brings charges based on decades-old events, it has an even higher duty to afford the accused a speedy trial.  *See* supra at 23.  Here, the DOJ elevated its insubstantial interest in making a tactically advantageous arrest over Mr. Khoury's far weightier Speedy Trial right.  Accordingly, the Indictment should be dismissed.

### C.     The Indictment Is Time-Barred and Should be Dismissed.

Counts 2, 3, 9, and 10 of the Indictment are plainly time-barred, as the 5-year limitations period applicable to those Counts expired years before the Indictment was returned, and well before the government obtained an order suspending the limitations period pursuant to 18 U.S.C. § 3292.  As for the remaining charges, even giving effect to suspension of the statute as required under § 3292, the limitations period applicable to each charge was due to expire as follows: Count 1 (mid-2009); Count 4 (Feb. 15, 2010); Count 5 (June 5, 2010); Count 6 (June 5, 2010); Count 7 (December 18, 2010); Count 8 (January 29, 2009); and Count 11 (April 24, 2011).  And, because sealing of the Indictment was improper from the outset, or at the least sealing lost any tolling effect after pretrial delay exceeded one year, all of these charges are time-barred as well.

### 1.     Counts 2, 3, 9 and 10 of the Indictment Are Time-Barred.

A defendant's interest in avoiding a stale federal prosecution is safeguarded primarily by 18 U.S.C. § 3282 ("no person shall be prosecuted … for any offense … unless the indictment is found or the information is instituted, within five years").  This prescription serves not only "to limit exposure to criminal prosecution to a certain fixed period," but also "to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time."  *Toussie v. United States*, 397 U.S. 112, 114-15 (1970).  Courts construe statutes of limitations in favor of repose.  *Id.* at 115.

33

Section 3292 of Title 18 allows for suspension of the statute of limitations in certain circumstances after the government requests evidence from a foreign country.  *See*, *e.g.*, *United States v. Meador*, 138 F.3d 986, 991 (5th Cir. 1998).  This section provides, in pertinent part, that "the district court before which a grand jury is impaneled … shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence…." 18 U.S.C. § 3292(a)(1).  The suspension ends when the foreign country "takes final action on the [U.S.] request," *id.* § 3292(b), but may not exceed three years. *Id*. § 3292(c)(1).  And, if final action occurs before the statute would otherwise expire, the limitations period is suspended for only six months.  *Id*. § 3292(c)(2).

Here, the government made its first request for foreign assistance on September 23, 2004, applied for an order suspending the statute of limitations on November 8, 2006, obtained the order on November 14, 2006, and received final action on its request for assistance on July 9, 2008.  *See* Misc. No. mc-06-452 (Under Seal).[6]  By November 8, 2006, however, the 5-year limitations period had already expired on Counts 2, 3, 9 and 10, all of which alleged violations that occurred prior to November 2001.  "[T]he 'plain language' of [§ 3292] requires that an application to suspend the running of the statute of limitations be filed *before* the limitations period has expired."  *United States v. Kozeny*, 541 F.3d 166, 174 (2d Cir. 2008) (emphasis added); *see also United States v. Csolkovits*, No. 08- cr-20474, 2012 WL 395450 at *6-7 (E.D. Mich. Feb. 7, 2012) (following *Kozeny*); *United States v. Brody*, 621 F. Supp. 2d 1196, 1199-1202 (D. Utah 2009) (same); *but see United States v. Bischel*, 61 F.3d 1429 (9th Cir. 1995) (government need not file § 3292 application before the statute of limitations expires).  Because § 3292 cannot revive a limitations period that is already expired, Counts 2, 3, 9 and 10 must be

---

[6] In the unlikely event the government disputes these assertions regarding the timing of events relevant to its § 3292 application, counsel will submit the related sealed documents for *in camera* review.

dismissed. *Kozeny*, 541 F.3d at 172 ("[w]e see no basis upon which to read the word 'suspend' in section 3292 to include the distinct concept of revival"); *cf. FDIC v. Belli*, 981 F.2d 838, 842 (5th Cir.1993) (amendments to statute of limitations do not revive expired claims).

### 2. The Sealing of the Indictment Lacked a Proper Purpose and Did Not Toll the Running of the Limitations Period for the Charges Not Already Time-Barred in November 2008.

Counts 1, 4, 5, 6, 7, 8 and 11 are also time-barred. An indictment ordinarily is "found," thereby tolling the running of the limitations period, when it is returned by the grand jury. *United States v. Srulowitz*, 819 F.2d 37, 40 (2d Cir. 1987). This is generally true even if the indictment is sealed. *Sharpe*, 995 F.2d at 51. However, courts recognize two important exceptions to this tolling rule: (1) when the sealing, or the length of the sealing, lacks a proper purpose or (2) when the sealing causes prejudice. *United States v. Gigante*, 436 F. Supp. 2d 647, 654 (S.D.N.Y. 2006) (citing cases). Where the government lacks a proper purpose in sealing the indictment, either initially or in maintaining the seal, "the indictment is considered to be 'found' upon the date of its unsealing." *Id.*; *see also* cases cited in table below at 41-42.

Regardless of whether an indictment was properly sealed, it "will not relate back to the time of its filing for limitations purposes if the defendant can demonstrate that substantial actual prejudice occurred between the sealing and the unsealing." *Sharpe*, 995 F.2d at 51. Then, "the indictment is not considered 'found' until it is unsealed," and the expiration of the limitations period before the indictment is unsealed warrants dismissal. *Srulowitz*, 819 F.2d at 40.

The sealing of the Indictment in November 2008 lacked a proper purpose for three independent reasons, each of which precludes tolling of the limitations period. ***First***, as explained above, having accused Mr. Khoury of a crime during the Stanley plea proceedings, the government was obliged promptly to provide him with a forum to contest the charges. *See* supra at 18-21. By sealing the Indictment when it was returned two months after smearing Mr.

Khoury, the government again deprived him of "[t]he fundamental requirement of due process [which] is the opportunity to be heard at a meaningful time and in a meaningful manner." *Doe*, 853 F.3d at 801 n.42 (citation and internal quotations omitted). The sealing of an indictment in violation of the defendant's Due Process rights is, *a fortiori*, ineffective in tolling the limitations period.

   ***Second***, when the government moved to seal the Indictment, it did not provide the magistrate judge with adequate reasons. The motion merely recited that "premature public disclosure of the Indictment could hinder the ability of law enforcement authorities to arrest the Defendant." Government's Motion to Seal [Dkt. 4]. This rote recital was unquestionably incomplete. Importantly, the motion did not reveal that: (1) the government publicly identified Mr. Khoury as an unindicted co-conspirator two months earlier; (2) his location and the identity of his counsel were well known; and (3) he resided in Lebanon and had not traveled to the U.S. in many years. In withholding these material facts, the government prevented the magistrate judge from making an ***informed*** decision regarding the need for sealing and its impact on Mr. Khoury's Speedy Trial rights. *See*, *e.g.*, *United States v. Maroun*, 699 F. Supp. 5, 6 (D. Mass. 1988) ("I [cannot] understand how a request can be addressed to the sound discretion of the magistrate if she is not informed as to the reason for the request or the facts in support of it.").

   ***Third***, the grounds for sealing recognized by courts are to: (1) protect the identity of an informant or witness; (2) avoid compromising an ongoing investigation; (3) locate a defendant; or (4) prevent flight from the jurisdiction or risk to public safety. *See*, *e.g.*, *Gigante*, 436 F.Supp. 2d at 656-59. None of these justifications was present in November 2008 when the Indictment was sealed, much less for the entirety of the sealing period. Notably, the government did not seal the indictments of others charged in the KBR/Stanley investigation. This is an admission by

conduct that neither of the first two traditional grounds for sealing was present when Mr. Khoury was indicted. *See United States v. Rogers*, 781 F. Supp. 1181, 1191 (S.D. Miss. 1991) (sealing of the indictment unnecessary where defendant already aware of investigation). Nor was it necessary to seal the Indictment in order to locate Mr. Khoury or to prevent his flight from the jurisdiction. As the Court well knows, the government contends that Mr. Khoury returned to Lebanon *in February 2004* and has remained there ever since. *See*, *e.g.*, Government's Request to Deny Defendant's Motion by Samir Khoury to Dismiss the Indictment [Dkt. 16] at Exhibit 1. This concession cannot be reconciled with the position that it was necessary to seal the Indictment to prevent his flight from the jurisdiction *in November 2008*.[7]

In all events, a decade-long sealing cannot be justified by the supposed need to locate and arrest a defendant. *United States v. Sherwood*, 38 F.R.D. 14 (D. Conn. 1964), a multi-defendant securities fraud case, is particularly instructive. There, the government obtained a sealing order when the indictment was returned because two of the three defendants were then outside the U.S. *Id.* at 18. The indictment was unsealed thirteen months later, after the limitations period had expired. *Id.* at 20. Finding that the need to locate the defendants did not justify this lengthy delay, the court dismissed the indictment, reasoning:

> The five-year criminal statute of limitations would have little or no meaning were the law to be construed otherwise. A person would never know with certainty that a sealed indictment might be lurking in undisclosed government files, held in abeyance for a year or years to satisfy the personal motives of a government official. To be a nation of law, and not subject to the whims of men, law must be administered uniformly and objectively. The United States of America has sufficient power, prestige, and facilities to openly indict a criminal and bring him to the bar of justice. It is not in keeping with our heritage, to destroy that image of America, by a policy of lying in wait with a sealed indictment, after the criminal

---

[7] With ready access to U.S. Customs records, the DOJ prosecutors knew or should have known that Mr. Khoury had traveled to the U.S. only once since 2004—to meet with the prosecutors in August 2006.

statute of limitations has run, waiting for an individual defendant to return across its borders.

*Id.*

In sum, the sealing of the Indictment was void *ab initio*. Furthermore, because the government procured the sealing on the basis of a questionable premise and incomplete information, the magistrate judge was unable to exercise informed discretion. In all events, no acceptable grounds for sealing were operative in November 2008. Therefore, the limitations period continued to run and, as explained in Section III.C.6 below, all of the charges not already time-barred in November 2008 became stale no later than April 2011.

> **3.    Even If the DOJ Had a Legitimate Reason to Seal the Indictment
> Temporarily, Continued Sealing Beyond One Year Was Unjustified
> and Did Not Thereafter Toll the Running of the Limitations Period.**

Even assuming *arguendo* that the government's interest in making a surprise arrest of a defendant supports **initial** sealing of an indictment, that interest cannot justify **indefinite** sealing. *Sharpe*, 995 F.2d at 51 n.5. Several district courts have found that sealing beyond a year after the expiration of the statute of limitations is presumptively unreasonable. *See*, *e.g.*, *United States v. Deglomini*, 111 F. Supp. 2d 198, 200 (E.D.N.Y. 2000) (fourteen month sealing period was unreasonable); *Heckler*, 428 F. Supp. at 272 ("[a] [sealing] period of more than twelve months is not reasonable."); *Rogers*, 781 F. Supp. at 1191 (following *Heckler)*. This limiting rationale comports with the principle recognized in the Speedy Trial context that pre-trial delay of more than one year is presumptively prejudicial to the defendant. *Doggett*, 505 U.S. at 652 n.1.

As noted above, when the sealing of the Indictment reached its one-year anniversary, the prosecutors knew that Mr. Khoury had not traveled to the U.S., and likely knew from Interpol and other sources that he had not left his native country. Given these circumstances, the "lying in wait" justification for sealing the Indictment lost any validity it may ever have had. *See*, *e.g.*,

38

*Heshelman*, 521 F. App'x at 509 ("[a]lthough the government could have reasonably waited for a short period of time for Heshelman to voluntarily return to the United States, once the wait became presumptively prejudicial, the intentional delay by the government was no longer justifiable."); *cf. Doggett*, 505 U.S. at 652 ("the Government's investigators made no serious effort to test their progressively more questionable assumption"). Therefore, sealing of the Indictment tolled the running of the limitations period for one year at most; thereafter the period began to run anew, and all of the charges became time-barred long ago.

### 4. Because Indefinite Sealing of the Indictment Was Improper, Mr. Khoury Need Not Show That He Was Prejudiced.

If there is no legitimate need for sealing an indictment or continuation of the seal, the statute of limitations continues to run even if the defendant has not shown actual prejudice resulting from the delay. *See*, *e.g.*, *Deglomini*, 111 F. Supp. 2d at 200 ("[w]here the government has no legitimate purpose served by keeping the indictment sealed beyond the expiration of the limitations period, the defendant[] need not show prejudice, even if the indictment was properly sealed initially"); *United States v. Thompson*, 104 F. Supp. 2d 1303, 1310 (D. Kan. 2000) (same). Furthermore, as explained above, this Circuit presumes prejudice in the analysis of Speedy Trial claims where the delay between indictment and trial exceeds five years. *See*, *e.g.*, *Bergfeld*, 280 F.3d at 491. There is no principled reason why such a delay should not also warrant a presumption of prejudice for purposes of the application of the limitations bar.

### 5. Alternatively, Because Sealing of the Indictment Actually and Substantially Prejudiced Mr. Khoury's Ability to Defend Against the Charges, the Running of the Limitations Period Was Not Tolled.

Even if a showing of prejudice were necessary, it is evident that Mr. Khoury has been severely prejudiced by the delay in unsealing the ten-year-old Indictment. *See* Section III.B, *supra*, describing the many forms of actual prejudice to Mr. Khoury caused by the government's

delay.  Significantly, the government *purposefully* created the circumstances that have

prejudiced Mr. Khoury.  By November 2008 when the Indictment was returned, the government

had already spent years gathering information that it believed was favorable to its case.  The

sealing of the Indictment prevented Mr. Khoury from having timely access to that information

and the opportunity to counter it with contrary evidence.  In a case where the underlying events

occurred as far back as the late 1980's, the prosecutors knew that the risk of exculpatory

evidence becoming stale or getting lost was particularly acute.  That risk has become reality for

Mr. Khoury.  The government must be charged with the knowledge that indefinite sealing of the

Indictment would deprive Mr. Khoury of the ability to utilize the tools available to him under

Fed. R. Crim. P. 15, 16, 17, and Letters Rogatory, to obtain exculpatory evidence before it was

lost to the passage of time.

### 6.    All Remaining Charges Are Time-Barred and Should Be Dismissed.

As explained above, the statute of limitations expired on Counts 2, 3, 9, and 10 before the

Indictment was returned.  *See* § III.C.1.  The statute of limitations expired on each of the

remaining charges in the Indictment, after giving the government credit for the applicable § 3292

suspension period, at the following times:  Count 1 (mid-2009); Count 4 (February 15, 2010);

Count 5 (June 5, 2010); Count 6 (June 5, 2010); Count 7 (December 18, 2010); Count 8 (January

29, 2009); Count 11 (April 24, 2011).[8]

---

[8] As noted above, the government obtained a suspension order pursuant to § 3292 on November 14, 2006, but received final action on its earliest request for foreign assistance on July 9, 2008.  *See* supra at 34. The last overt act in the conspiracy alleged in Count 1 occurred in "early 2004," and the offense charged in Count 8 allegedly occurred on July 29, 2003.  Because the statute of limitations applicable to Counts 1 and 8 had not expired at the time the government received final action, the limitations periods for these charges were extended only six months. *See* 18 U.S.C. § 3292(c)(2).  The limitations periods for Counts 4-7 and 11 were extended three years.  See *Id*. § 3292 (c)(1).

For ease of reference, we list in the table below cases in which courts have dismissed indictments where the statute of limitations expired while charges were under seal, and where the initial sealing, or the duration of the sealing, was determined to be unwarranted.

| Case | Duration of Sealing | Disposition |
|------|---------------------|-------------|
| *United States v. Gigante*, 436 F. Supp. 2d 647 (S.D.N.Y. 2006) | 21 months | Motion to dismiss on SOL grounds granted |
| *United States v. Upton*, 339 F. Supp. 2d 190 (D. Mass. 2004) | 14.5 months | Motion to dismiss certain counts on SOL grounds granted |
| *United States v. Deglomini*, 111 F. Supp. 2d 198 (E.D.N.Y. 2000) | 14 months | Motion to dismiss on SOL grounds granted |
| *United States v. Thompson*, 104 F. Supp. 2d 1303 (D. Kan. 2000) | 11 months | Motion to dismiss on SOL grounds granted |
| *United States v. Rogers*, 781 F. Supp. 1181 (S.D. Miss. 1991) | 21 months | Motion to dismiss on SOL, and Speedy Trial grounds, granted |
| *United States v. Maroun*, 699 F. Supp. 5 (D. Mass. 1988) | 9 months (approx.)[9] | Motion to dismiss on SOL grounds granted |
| *United States v. Cosolito*, 488 F. Supp. 531 (D. Mass. 1980) | 2 months | Motion to dismiss on SOL grounds granted |
| *United States v. Heckler*, 428 F. Supp. 269 (S.D.N.Y. 1976) | 14 months | Motion to dismiss for undue pre-indictment delay, and delay in unsealing, granted |
| *United States v. Sherwood*, 38 F.R.D. 14 (D. Conn. 1964) | 13 months | Motion to dismiss on SOL grounds granted |

The pretrial delay for which the government is responsible in this case—over 120 months and counting—is ***more than five times longer*** than the longest period of delay found to require dismissal in the above-cited cases.  Consequently, the Indictment was "found" many years after

---

[9] The *Maroun* court did not indicate when the indictment was unsealed, although the opinion was written on October 31, 1988—nine months after the indictment was sealed and eight months after the statute of limitations had run.

41

the statute of limitations expired, all the charges alleged are now time-barred, and the Indictment should be dismissed.

## IV.    CONCLUSION

For all of the foregoing reasons, the Indictment should be dismissed on Speedy Trial and statute of limitations grounds.

Dated: April 19, 2019

/s/ Charles S. Leeper
Charles S. Leeper (*admitted pro hac vice*)
**DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W., Suite 1100
Washington, D.C. 20005-1209
Telephone:  (202) 842-8800
Facsimile:   (202) 842-8465
Email:         Charles.Leeper@dbr.com

David Gerger
**GERGER, KHALIL & HENNESSY LLP**
1001 Fannin Street, Suite 2450
Houston, Texas 77002
Telephone:  (713) 224-4400
Facsimile:   (713) 224-5153
Email:         DGerger@gkhfirm.com

*Counsel for Defendant Samir Khoury*

42

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing **Renewed Motion of Samir Khoury To Dismiss The Indictment For Violation Of His Right To A Speedy Trial, And As Time-Barred, And Memorandum In Support Thereof** was filed and served electronically by the Court's CM/ECF system on this 19th day of April, 2019.


*/s/  Charles S. Leeper*
 Charles S. Leeper

43