**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § | |
| **VS.** | § § | **CRIMINAL ACTION NO. 4:08-CR-0763** |
| **SAMIR RAFIC KHOURY** | | |

**MEMORANDUM AND ORDER**

Before the Court is Defendant's Renewed Motion to Dismiss. (Doc. No. 37). Defendant argues that the Court should dismiss the pending indictment "on Speedy Trial and statute of limitations grounds." (Doc. No. 37 at 42). The Court determines that neither ground justifies dismissal of the indictment.

**I.     Background**

Mr. Khoury is a naturalized citizen of the United States, and a native of Lebanon. (Doc. No. 1, ¶1). He worked for The M.W. Kellogg Company ("Kellogg") in the Middle East from 1977 through 1988. (Doc. No. 1, ¶1). In 1988, he switched to working as a consultant for various firms including Kellogg, and later Kellogg's successor, Kellogg, Brown & Root, Inc. ("KBR"). (Doc. No. 1, ¶1). That same year, Mr. Khoury moved his residence to Cleveland, Ohio. (Doc. No. 1, ¶1). Ohio remained Mr. Khoury's permanent residence until he relocated to Lebanon in 2004, around the same time that it became known that KBR was being investigated for violations of the Foreign Corrupt Practices Act ("FCPA"). (Doc. No. 38 at 3–4.) Mr. Khoury has not left Lebanon since, with one exception: a 2006 trip to the U.S. to speak with prosecutors. (Doc. No. 37 at 4–5, 38).

In September 2008, Mr. Albert Jackson Stanley, the former CEO of KBR, pleaded guilty

to one count of conspiracy to violate the FCPA and one count of conspiracy to commit mail and wire fraud in connection with "kickbacks" allegedly paid to Mr. Stanley by an unindicted consultant. *United States v. Albert J. Stanley*, No. 4:08-cr-0597 (S.D. Tex. 2008) (Ellison, J.) (Doc. No. 9, ¶ 22). He was subsequently sentenced to 30 months imprisonment and ordered to pay $10.8 million in restitution. *Stanley*, No. 4:08-cr-0597 (Dkt. Entry February 23, 2012). Although Mr. Khoury was not identified by name in the indictment, he claims that the personal details given during the proceedings made it obvious to him and others in his industry that he was the consultant to whom the government was referring. (Doc. No. 37 at 18–19). When asked by Mr. Khoury's attorney, the government refused to confirm or deny whether an indictment had been or would be filed against him. (Doc. No. 11 at 2).

On November 24, 2008, a grand jury returned an indictment charging Mr. Khoury with conspiring to commit mail and wire fraud. (Doc. No. 1, ¶¶ 2–3, 5–7). The indictment alleged that Mr. Khoury paid approximately $11 million in kickbacks to Mr. Stanley in exchange for providing lucrative consulting fees to Mr. Khoury's company. (Doc. No. 1, ¶¶ 2–3, 5–7). The indictment was placed under seal when it was returned. (Doc. No. 5).

In January 2009, the government entered Mr. Khoury's arrest warrant into the National Crime Information Center ("NCIC") database to alert border officials in the event Mr. Khoury attempted to re-enter the United States. (Doc. No. 38-1, ¶4). In May 2009, the government issued an INTERPOL Wanted Person Diffusion to twelve countries (not including Lebanon) through the U.S. National Central Bureau for Interpol. (Doc. No. 37-2 at 4). The government later issued another Diffusion to the twelve countries in 2015, and an INTERPOL Red Notice in 2019. (Doc. No. 38 at 15–16.) An Interpol Red Notice alerts foreign governments to the issuance of a U.S. arrest warrant, while a Diffusion Notice, which is less formal than a Red Notice, may be sent to

select countries to obtain assistance in locating, arresting and detaining a wanted subject. *About Notices*, INTERPOL, https://www.interpol.int/How-we-work/Notices/About-Notices (last visited Sept. 25, 2019).

In December 2014, Mr. Khoury moved to unseal and dismiss the indictment he suspected was pending against him, but the motions were denied. (Doc. No. 11 at 10); *see also United States v. Khoury*, 4:14-mc-2884 (Dec. 12, 2014). Mr. Khoury next brought a civil suit challenging his public identification as an unindicted co-conspirator in federal court in the *Stanley* case. *See Doe v. United States*, 4:15-MC-2414 (Aug. 20, 2015). The Fifth Circuit in that case held that the civil suit was time-barred. *Doe v. United States*, 853 F.3d 792 (5th Cir. 2017). In 2017, Mr. Khoury brought another action to unseal and dismiss the indictment that he believed to be pending against him. *United States v. Khoury*, 4:17-mc-2553. This Court granted the motion to unseal the indictment on July 9, 2018. *Khoury*, 4:17-mc-2553 (Doc. No. 25). At that point, Mr. Khoury refiled his motion to dismiss in his criminal case. *United States v. Khoury*, 4:08-cr-0763 (Doc. No. 11). In November 2018, the Court declined to apply the fugitive disentitlement doctrine (Dkt. Entry Nov. 29, 2018), which is an equitable doctrine allowing a court discretion to refuse to consider the merits of a defendant's motion or appeal when the defendant is a fugitive from justice. *Bagwell v. Dretke*, 376 F.3d 408, 410 (5th Cir. 2004). In March 2019, the Court ordered that the government provide Mr. Khoury with further evidence about its attempts to bring him to trial. (Doc. No. 26). Mr. Khoury's Renewed Motion to Dismiss (Doc. No. 37), now before the court, incorporates that evidence. After a hearing on the Renewed Motion to Dismiss, the Court requested and received supplemental briefing on the availability of extradition of dual nationals from Lebanon. (Doc. Nos. 44, 45, 46). Having considered the parties' briefing, the evidence, and the applicable law, the Court denies Mr. Khoury's Renewed Motion to Dismiss. (Doc. No. 37).

## II. Discussion

Mr. Khoury argues that the Court should dismiss the inditement against him on two grounds. First, he argues that the decade-long delay in prosecution has deprived him of his Sixth Amendment right to a speedy trial. Second, he argues that the indictment is time-barred by 18 U.S.C. § 3282. The Court finds neither argument persuasive.

### A. Speedy Trial

The Sixth Amendment guarantees that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. Amend. VI. Excessive delay in prosecuting a defendant after he is indicted or arrested violates this Sixth Amendment right. *Barker v. Wingo*, 407 U.S. 514 (1972); *Doggett v. United States,* 505 U.S. 647 (1992). Mr. Khoury argues that the roughly decade-long delay in prosecuting his case is excessive and that his motion to dismiss should therefore be granted.

Courts evaluate speedy trial claims by analyzing the *Barker* factors: (1) the length of the delay; (2) whether the delay is attributable to the government or the defendant; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant suffered any prejudice from the delay. 407 U.S. at 530. None of the factors is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id*. at 533.

*Barker* factors (1), (3), and (4) favor Mr. Khoury. The government concedes under factor (1) that "the passage of more than nine years between the return and unsealing of the indictment triggers a speedy trial analysis and weighs in Defendant's favor." (Doc. No. 38 at 9); *see also United States v. Cardona*, 302 F.3d 494, 497 (5th Cir. 2002) ("Because of the extraordinary delay of over five years, this factor weighs heavily in Cardona's favor."). Factor (3) also weighs in Mr.

Khoury's favor. Mr. Khoury asserted his right to a speedy trial in December 2014 when he moved both to unseal and dismiss on speedy trial grounds the indictment that he surmised was pending against him. (Doc. No. 37 at 8–9). Finally, Mr. Khoury has made a showing of actual prejudice under factor (4) because at least a dozen potential defense witnesses have allegedly died since 2009. (Doc. No. 37, Exh. E). The delay has also hampered Mr. Khoury's ability to preserve documents and to testify credibly in his own defense about an offense that allegedly occurred roughly twenty-five years ago.

However, "[t]he flag all litigants seek to capture is the second factor, the reason for delay." *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). In assessing this factor, "the conduct of both the prosecution and the defendant are weighed." *Barker*, 407 U.S. at 530. Here, the balance tips strongly in the government's favor. While the government has proceeded with "reasonable diligence," *Doggett*, 505 U.S. at 656, Mr. Khoury has purposefully evaded the government's efforts by remaining in Lebanon. Mr. Khoury thus bears the blame for the delay.

Mr. Khoury argues that the government failed to act with reasonable diligence because the only actions it took in the first six years after sealing the indictment were in 2009 when it entered Mr. Khoury's arrest warrant into the NCIC database and issued an INTERPOL Diffusion. (Doc. No. 37 at 26). The government argues that it did everything it reasonably could have been expected to do, given that Mr. Khoury has resided in Lebanon since 2004. (Doc. No. 38 at 9). At the heart of the parties' dispute, lies the issue whether it was unreasonable for the government not to request Mr. Khoury's extradition.

As evidence that extradition was unavailable, the government has submitted a declaration from Jeffrey M. Olson, an Associate Director at the Office of International Affairs ("OIA"). (Doc. No. 44-1). Mr. Olson attests that it would have been futile to request Mr. Khoury's extradition

because "[t]he United States and Lebanon do not have a bilateral extradition treaty," and "Article 32 of the Lebanese Criminal Code prohibits the extradition of Lebanese Citizens, including [dual citizens]." (Doc. No. 44-1, ¶¶ 6–8). Article 32 provides that "[o]ffences falling within the territorial jurisdiction or the jurisdiction *rationae materiae* or *ratione personae* of Lebanese law . . . may not give rise to extradition," while Article 20 defines jurisdiction *ratione personae* as jurisdiction over "any Lebanese national who, acting outside Lebanese territory . . . commits a felony or misdemeanor that is punishable under Lebanese law." LEB. PENAL CODE ARTS. 20, 32 (Doc. No. 45-1). Mr. Olson's explains that his understanding of Article 32 is "based on OIA's communications with Lebanese government officials" and that he is "unaware of any instances in which Lebanon has agreed to extradite to the United States any person deemed to be a Lebanese citizen or dual citizens of Lebanon and another country." (Doc. No. 44-1, ¶¶ 6–8). Additionally, the government submitted a declaration from Tom Heinemann, Assistant Legal Advisor in the State Department, in which Mr. Heinemann states that it is also his understanding "that Article 32 of the Lebanese Criminal Code prohibits the extradition of Lebanese nationals" and that this understanding is "based on public representations of the Government of Lebanon . . . and on direct communications between Lebanon and the United States with respect to past extradition requests." (Doc. 46, Exh. B).

In response, counsel for Mr. Khoury has helpfully provided two declarations from experts on Lebanese extradition law. One is from Judge Afif Chamseddine, member of the Appeals Chamber of the Special Tribunal for Lebanon in The Hague (Doc. No. 45, Exh. B), the other from Judge Hatem Madi, the former Public Prosecutor of Lebanon's Court of Cassation (Doc. No. 45, Exh. C). Judge Chamseddine concludes that the phrase "may not give rise to" in Article 32 is discretion-laden and that it is thus "possible to extradite a foreign national," but only "in light of

the decision-making and the assessment of the Lebanese authorities in each case separately." (Doc. No. 45, Exh. B). Judge Madi agrees that Article 32 does not "explicit[ly] and direct[ly]" prohibit the extradition of Lebanese citizens, and concludes that a request to extradite a Lebanese citizen is "subject to the decision of the Lebanese government, which has the sole right to accept it or to reject it . . . based on its absolute discretionary authority[.]" (Doc. 45, Exh. C).

The Court need not settle the parties' dispute over how to interpret Article 32. Even assuming that Article 32 reserves to the Lebanese government discretion to extradite Lebanese citizens, the record contains no indication that the Lebanese government is willing to exercise its discretion in this manner. Neither party has cited to a single instance in which the Lebanese government has agreed to extradite a Lebanese citizen to the United States. Further, both Mr. Olson and Mr. Heinemann attest that past conversations with Lebanese officials left them with the clear understanding that extradition is unavailable. The government thus had good reason to conclude that requesting Mr. Khoury's extradition would have been an exercise in futility. "[W]here our government has a good faith belief supported by substantial evidence that seeking extradition from a foreign country would be futile, due diligence does not require our government to do so." *U.S. v. Corona-Verbera*, 509 F.3d 1105, 1114–15 (9th Cir. 2007); *see also U.S. v. Tchibassa*, 452 F.3d 918, 924–25 (D.C. Cir. 2006) (defendant "was more to blame than the government for the initial delay because he maintained his residence in Zaire, beyond the government's diplomatic reach," and the government is not required to pursue "extraordinary measures" where no extradition treaty exists). Under the circumstances, the government demonstrated reasonable diligence.

Mr. Khoury further argues that "[t]he government's tactical decision to deny Mr. Khoury notice of the indictment, and affirmative actions to prevent unsealing, make the government solely responsible for the delay." (Doc. No. 39 at 4). But the government's reasonable decision to seal

the indictment did not leave Mr. Khoury unaware of his indictment. *Cf. United States v. Brown*, 169 F.3d 344, 349 (6th Cir. 1999) (holding that the government "failed to prove that Brown was actually culpable in causing the delay in his case" because it "did not present credible evidence that Brown was aware of the issuance of the indictment"). In this case, the government has provided credible evidence that, even during the period the indictment was sealed, Mr. Khoury strongly suspected his indictment and chose to remain in Lebanon as a result. The government points to evidence that Mr. Khoury moved to Lebanon in 2004, around the time the DOJ began its investigation (Doc. No. 16-1); that Mr. Khoury has not been back since, except for one trip in 2006 under the terms of a safe passage letter issued as part of the investigation (Doc. No. 16-1); that by September 2008, Mr. Khoury was aware that he was implicated as a co-conspirator (Doc. No. 37 at 6–7); and that by 2014, Mr. Khoury had filed a motion to unseal and dismiss the indictment he presumed was pending against him (4:14-mc-02884, Doc. No. 1). Indeed, Mr. Khoury claims that he and others in the industry could readily tell that he was the unidentified consultant referred to in Mr. Stanley's indictment issued in 2008. (Doc. No. 37 at 18).

Collectively, these facts constitute credible evidence that Mr. Khoury remained in Lebanon purposely to evade prosecution during the roughly ten-year period in question. "[A] defendant who intentionally evades the government's efforts to bring him to trial is culpable in causing the delay." *United States v. Ingram*, 446 F.3d 1332, 1337–38 (11th Cir. 2006) (internal citations omitted). Thus, "the prejudice growing from such delay cannot be weighed in his favor." *Brown*, 169 F.3d at 349. The Court therefore determines that the balance of *Barker* factors weighs in the government's favor. Mr. Khoury's Sixth Amendment right to a speedy trial has not been violated.

**B. Statute of Limitations**

Title 18 includes a general five-year statute of limitations for non-capital federal crimes.

18 U.S.C. § 3282(a) (2018) ("[N]o person shall be prosecuted . . . for any offense . . . unless the indictment is found or the information is instituted, within five years"). An indictment ordinarily is "found," thereby tolling the running of the limitations period, when it is returned by the grand jury. *United States v. Srulowitz*, 819 F.2d 37, 40 (2d Cir. 1987). This is generally true even if the indictment is sealed. *United States v. Sharpe*, 995 F.2d 49, 51 (5th Cir. 1993). However, "[a] sealed indictment will not relate back to the time of its filing for limitations purposes if the defendant can demonstrate that *substantial actual prejudice* occurred between the sealing and the unsealing." *Sharpe*, 995 F.2d at 51 (emphasis added). In that circumstance, courts will consider the indictment "found" when it is unsealed. *Id.*

The five-year limitations period established by § 3282(a) may, under certain conditions, be suspended for a limited period prior to the filing of an indictment. One such condition is established by 18 U.S.C. § 3292. Section 3293, which is entitled "Suspension of limitations to permit United States to obtain foreign evidence," allows for a maximum three-year suspension of the limitations period in certain circumstances after the government requests evidence from a foreign country. The government, as discussed further below, relies on § 3292 to defend the timeliness of Counts Two, Three, Nine, and Ten of the indictment.

Mr. Khoury argues that all charges in the indictment are time-barred by 18 U.S.C. § 3282. (Doc. No. 37 at 41-50). To defend this claim, Mr. Khoury invokes the *Sharpe* "substantial actual prejudice" exception to argue that his indictment was not "found" until it was unsealed on July 9, 2018—well after the § 3282 limitations period had run. He separately argues that Counts Two, Three, Nine, and Ten of the indictment are time-barred because the "5-year limitations period applicable to those Counts expired . . . before the government obtained an order suspending the limitations period pursuant to 18 U.S.C. § 3292." The Court addresses each argument in turn.

1. **The *Sharpe* Exception**

"A sealed indictment will not relate back to the time of its filing for limitations purposes if the defendant can demonstrate that substantial actual prejudice occurred between the sealing and the unsealing." *Sharpe*, 995 F.2d at 51. Mr. Khoury argues that, because he was prejudiced by the government's decision to seal his indictment, his indictment was not "found" for purposes of § 3282 until it was unsealed on July 9, 2018. (Doc. 37 at 39–40). Accordingly, Mr. Khoury argues that all counts in the indictment are time-barred because the § 3282 statute of limitations expired before July 9, 2018. (Doc. 37 at 39–40).

For the reasons stated in Section II.A, the Court agrees that Mr. Khoury suffered "substantial actual prejudice . . . between the sealing and the unsealing." *Sharpe*, 995 F.2d at 51. The government has argued persuasively, however, that the prejudice to Mr. Khoury is "self-inflicted." (Doc. No. 38 at 38). As discussed above, the delay in Mr. Khoury's case was caused by his decision to retreat to Lebanon, not the government's decision to seal. The Court doubts that the Fifth Circuit intended for the *Sharpe* exception to extend to cases involving self-inflicted prejudice. Applying the rule rather than the exception, the Court therefore finds that Mr. Khoury's indictment was "found" when it was filed and sealed on November 24, 2008.

Mr. Khoury argues that this Court should recognize an exception for instances in which the indictment was sealed for an improper purpose or an inappropriate amount of time. *See e.g.*, *United States v. Gigante*, 436 F. Supp. 2d 647, 654 (S.D.N.Y. 2006); *United States v. Sherwood*, 38 F.R.D. 14 (D. Conn. 1964). The Court agrees that "the government's ability to toll the statute of limitations by sealing and indictment is not unlimited." *Sharpe*, 995 F.2d at 52 n.5. Under the circumstances, however, the government's decision to seal the indictment was of reasonable purpose and length. In particular, it was reasonable to keep the indictment sealed to increase the

likelihood that Defendant would venture outside Lebanon where he could be apprehended.

## 2. Section 3292 Suspension

Counts Two, Three, Nine and Ten allege conduct that occurred between December 8, 2000 and August 24, 2001. (Doc. No. 1). The indictment was filed and sealed on November 24, 2008. (Doc. No. 1). Thus, absent tolling of the § 3282 statute of limitations, Counts Two, Three, Nine and Ten would have been time-barred at the time of indictment.

The government relies on the suspension provision in § 3292 to argue that the counts are not time-barred. (Doc. No. 38 at 34). Section 3292 provides:

> **(a)(1)** Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense *shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence* and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.
>
> **(2)** The court shall rule upon such application not later than thirty days after the filing of the application.
>
> **(b)** Except as provided in subsection (c) of this section, *a period of suspension under this section shall begin on the date on which the official request is made* and end on the date on which the foreign court or authority takes final action on the request.
>
> **(c)** The total of all periods of suspension under this section with respect to an offense--
>
>     **(1)** *shall not exceed three years*; and
>
>     **(2)** shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section.
>
> **(d)** As used in this section, the term "official request" means a letter rogatory, a request under a treaty or convention, or any other request for evidence made by a court of the United States or an authority of the United States having criminal law enforcement responsibility, to a court or other authority of a foreign country.

18 U.S.C. § 3292 (emphasis added). In Mr. Khoury's case, the government made an official request for evidence to a foreign country on September 30, 2004, and in November 2006 applied

for and received an order suspending the limitations period. (Doc. 38 at 34). Final action on the request occurred in July 2008. (Doc. 38 at 34).

Relying on § 3292, the government argues that Counts Two, Three, Nine and Ten are not time-barred because the five-year limitations period was suspended starting on September 30, 2004, the date the government requested foreign aid. *See United States v. Bischel*, 61 F.3d 1429, 1434 (9th Cir. 1995) ("[T]he statute plainly contemplates that the starting point for tolling the limitations period is the official request for evidence, not the date the § 3292 [application] is made or granted"). The suspension lasted for the statutory maximum of three years because final action on the request was not received until July 2008. *See* 18 § 3292(c)(1) (The period of suspension "shall not exceed three years"). Thus, the limitations period for each count was suspended between September 30, 2004 and September 30, 2007. Once that three-year suspension is added to the original five-year limitations period, it is clear that Counts Two, Three, Nine and Ten are not time-barred.

Mr. Khoury argues that the government's reasoning is flawed because, although the government requested foreign aid on September 30, 2004, it waited until November 2006 to apply for a court order suspending the limitations period pursuant to § 3292. By then, the argument goes, there was no statute of limitations to "suspend" because the five-year statute of limitations on Counts Two, Three, Nine and Ten had expired between December 8, 2005 and August 24, 2006. (Doc. No. 37 at 34). In support of this argument, Mr. Khoury points to *United States v. Kozeny*, in which the Second Circuit held that "the plain language of [§ 3292] requires that an application to suspend the running of the statute of limitations be filed before the limitations period has expired." 541 F.3d 166, 174 (2d Cir. 2008). The Ninth Circuit has held otherwise however. *See Bischel*, 61 F.3d at 1434 (rejecting Defendant's argument that a

§ 3292 order cannot "revive" an expired period of limitations). The Fifth Circuit has not addressed whether § 3292 suspension is appropriate when the government makes an official request for foreign evidence before the statute of limitation has run, but applies for suspension of the statute of limitations after it has run. The issue is a close one. The Court determines, however, that the text of § 3292 favors the government's view that the application for suspension may be filed any time prior to filing of the indictment, so long as the official request for evidence is made while the statute of limitations is still running. Again, § 3292 provides in relevant part:

> *Upon application of the United States, filed before return of an indictment*, indicating that evidence of an offense is in a foreign country, the district court . . . shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country. . . . [A] period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.

18 U.S.C. § 3292 (emphasis added). The Court hesitates to read the phrase "filed before return of an indictment" to mean, as Mr. Khoury would have it, "filed before return of an indictment and before expiration of the un-tolled statute of limitations." The Court therefore agrees with the government's interpretation of § 3292 and holds that Counts Two, Three, Nine and Ten are not time-barred.

III. Conclusion

The Court **DENIES** Defendant's Renewed Motion to Dismiss. (Doc. No. 37).

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 6th day of December 2019.

_____
HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE